```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2     _____

3     Make The Road New York, et al., )  Civil Action
                                       )  No. 1:19-cv-02369-KBJ
4                      Plaintiffs,     )
                                       )  **Preliminary Injunction**
5     vs.                              )  (via Zoom videoconference)
                                       )
6     Chad F. Wolf, et al.,            )  Washington, D.C.
                                       )  November 13, 2020
7                      Defendants.     )  Time:  10:00 a.m.
      _____

8
                  Transcript of **Preliminary Injunction**
9                           held before
                  The Honorable Ketanji Brown Jackson
10                   United States District Judge
      _____
11
                      A P P E A R A N C E S
12
      For the Plaintiffs Make the Road New York, La Union Del Pueblo
13    Entero, and WeCount!:
                           **Anand Balakrishnan**
14                         **Lee Gelernt**
                           **Michael Tan**
15                         AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                           125 Broad Street, 18th Floor
16                         New York, New York 10004

17                         **Spencer E. Wittmann Amdur**
                           **Stephen B. Kang**
18                         AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                           Immigrants' Rights Project
19                         39 Drumm Street
                           San Francisco, California 94111
20
                           **Celso Perez**
21                         ACLU IMMIGRANTS' RIGHTS PROJECT
                           125 Broad Street, 18th Floor
22                         New York, New York 10004

23                         **Arthur B. Spitzer**
                           **Scott Michelman**
24                         AMERICAN CIVIL LIBERTIES UNION OF THE
                           DISTRICT OF COLUMBIA
25                         915 15th Street, Northwest, 2nd Floor
                           Washington, D.C. 20005
```

 1   For the Plaintiffs Make the Road New York, La Union Del Pueblo
     Entero, and WeCount! (continued):
 2                       **Trina A. Realmuto**
                         NATIONAL IMMIGRATION LITIGATION ALLIANCE
 3                       10 Griggs Terrace
                         Brookline, Massachusetts 02446
 4
                         **Joshua Polster**
 5                       SIMPSON THACHER & BARTLETT LLP
                         425 Lexington Avenue
 6                       New York, New York 10017
 7                       **Adrienne V. Baxley**
                         SIMPSON THACHER & BARTLETT LLP
 8                       900 G Street, Northwest
                         Washington, D.C. 20001
 9
     For the Defendants:
10                       **Erez Reuveni**
                         UNITED STATES DEPARTMENT OF JUSTICE
11                       P.O. Box 868
                         Ben Franklin Station
12                       Washington, D.C. 20044
13                       **Rebecca M. Cutri-Kohart**
                         U.S. DEPARTMENT OF JUSTICE
14                       Civil Division, Federal Programs Branch
                         1100 L Street, Northwest
15                       Washington, D.C. 20005
     _____
16
     Court Reporter:     Nancy J. Meyer
17                       Official Court Reporter
                         Registered Merit Reporter
18                       Certified Realtime Reporter
                         United States Courthouse, Room 6509
19                       333 Constitution Avenue, Northwest
                         Washington, D.C. 20001
20   _____

21   Proceedings reported by machine shorthand; transcript produced
     by computer-aided transcription.
22
     All parties participated via Zoom videoconference.
23   _____

24

25

1              P R O C E E D I N G S

2              (REPORTER'S NOTE:  This hearing was held during the
COVID-19 pandemic restrictions and is subject to the
3    limitations of technology associated with the use of
technology, including but not limited to telephone and video
4    signal interference, static, signal interruptions, and other
restrictions and limitations associated with remote court
5    reporting via telephone, speakerphone, and/or
videoconferencing.)

6

7              THE COURTROOM DEPUTY:  Your Honor, this is Civil

8    Action 19-2369, Make the Road New York, et al. versus Chad F.

9    Wolf, et al.

10             Starting with plaintiffs' counsel, I'm going to ask

11    that you identify yourselves for the record.

12             MR. BALAKRISHNAN:  Thank you.  This is Anand

13    Balakrishnan for the plaintiffs.  And I will go ahead and I'll

14    also list off the other members of plaintiffs' team who are

15    here today.  Appearing on video are Celso Perez and Spencer

16    Amdur.  Not on video but also appearing are Scott Michelman,

17    Lee Gelernt, Michael Tan, Stephen Kang, Trina Realmuto, Joshua

18    Polster, Andrienne Baxley, and Arthur Spitzer.

19             THE COURT:  Thank you, Mr. Balakrishnan.  Are you

20    going to be the only lawyer who is arguing on behalf of the

21    plaintiffs this morning?

22             MR. BALAKRISHNAN:  Your Honor, with the Court's

23    permission, I would like to share argument with the two

24    colleagues of mine who are on video, with Mr. Amdur presenting

25    on the appointments claim regarding Defendant McAleenan and

```
 1    Mr. Perez responding to the government's arguments in its

 2    motion to strike.

 3              THE COURT:  All right.  Thank you.

 4         Let me have defense counsel, please.

 5              MR. REUVENI:  Good morning, Your Honor.  Erez Reuveni

 6    for the defendants, and with me today is co-counsel

 7    Rebecca Cutri-Kohart.  And with the Court's permission as well,

 8    we'd like to split argument, with Ms. Cutri-Kohart handling the

 9    appointments claim and I'll be handling the rest.

10         And there's just one further -- with the Court's

11    indulgence, one somewhat important housekeeping matter we'd

12    like to address with the Court before we get into argument, as

13    it may affect how you choose to proceed with the proceeding

14    this morning.

15              THE COURT:  All right.

16              MR. REUVENI:  Ms. Cutri-Kohart will address that.

17              THE COURT:  Thank you.  Good morning,

18    Ms. Cutri-Kohart.

19              MS. CUTRI-KOHART:  Good morning, Your Honor.

20         I have one item I'd like to bring to the Court's

21    attention in Count 7, which is the appointments claim.  The

22    government makes the argument that there was a defect in --

23    if -- if there was a defect in Mr. McAleenan's service when he

24    issued the expedited removal designations, the ratification

25    cures that defect.
```

1    Last night we learned the factual basis underpinning

2    that argument is likely incorrect.  It appears likely that the

3    order of succession that Mr. Gaynor signed was signed

4    approximately one hour before Mr. Wolf's nomination was

5    submitted to the Senate.  We're continuing to confirm that

6    sequence of events in order to do our due diligence and verify.

7    However, this is contrary to what we stated in -- on page 30 of

8    our opposition brief where we explained that Gaynor became the

9    Acting Secretary when the nomination was submitted and then

10    changed the order of succession.  I apologize for this likely

11    inaccuracy in our briefing.

12    The government would like some time to consider this

13    information, make sure it's correct, and then let you know how

14    it affects the continued viability of the ratification

15    argument, and if it does, if those are problems, the argument

16    can be cured.  If the Court would permit it, the government

17    proposes submitting a short supplemental brief one week from

18    today confirming what we know about the timing of the signature

19    and explaining any impact it might have on the ratification

20    argument.

21    That said, we're prepared go ahead and address

22    ratification today if the Court will find curing arguments on

23    the issue helpful.

24    THE COURT:  All right.  Well, I need to process

25    because obviously that is new information.  I don't necessarily

```
1    want to put plaintiffs' counsel on the spot, but let me talk to
2    Mr. Amdur just about whether or not plaintiff would like to go
3    forward or permit the government to -- or would like the Court
4    to permit the government to reduce to writing these
5    representations and obviously allow the plaintiff to respond.
6    And -- and we can reconvene once we've sorted out whether the
7    government is still persisting with their ratification claim.
8              MR. AMDUR:  Your Honor, I think we would -- would
9    obviously defer to -- to the way you prefer to proceed.  I
10   certainly think that some, you know, amount of supplemental
11   explanation from the government makes sense here, and we'd
12   obviously appreciate an opportunity to respond to that.
13        The one thing I would note about ratification, you know,
14   we have a number of arguments for why ratification was invalid
15   here.  You know, at least one of them sort of doesn't -- it
16   doesn't depend on the validity of the Gaynor order or of Wolf's
17   appointment as Acting Secretary subsequently.  And that's our
18   argument that ratification is simply barred by section 3348 of
19   the Vacancies Act.  That -- that would not be impacted by these
20   developments, but I would defer to Your Honor whether it's
21   worth Your Honor having any argument about the ratification
22   issue at this point.
23              THE COURT:  Well, I think we should proceed for now
24   just because we've all sort of geared up to think about this
25   case, and I do appreciate the government's representations.  I
```

1    will allow you to have the time that you've requested to

2    evaluate the impact of this new information on the ratification

3    arguments that you have made in your brief and that you seek to

4    advance, but let me -- let's go forward today, in any event, to

5    the extent possible.  And where this argument may impact, we

6    can sort of flag it and set it to the side.

7         But I'd like to kind of hear from the parties with

8    respect to the other aspects of -- of the preliminary

9    injunction request, including -- I mean, one of my first

10   questions -- and I have some prefatory remarks that I will

11   make.  But one of my first questions had to do with the extent

12   to which the entire appointments issue resolves the -- the PI

13   such that we no longer have to talk about anything else.  And

14   we'll get to that.

15        But let me -- let me just start out by making clear to

16   everyone involved that this is a hearing regarding a motion for

17   a preliminary injunction that plaintiffs have filed in this

18   case challenging a notice that the Department of Homeland

19   Security issued on July 23rd, 2019, purporting to exercise the

20   full remaining scope of the agency's statutory authority to

21   place in expedited removal noncitizens who are located in the

22   interior of the country and who do not demonstrate to the

23   satisfaction of an immigration officer that they have been

24   physically present in the United States continuously for the

25   two-year period immediately preceding the date of the

1    determination of inadmissibility.

2        This matter has a lengthy procedural history.  I'm fully

3    aware of the case.  I won't recount all of the previous steps,

4    other than to note that the Court -- this Court previously

5    issued a preliminary injunction, and my order was subsequently

6    reversed by the D.C. Circuit, and the preliminary injunction

7    was lifted such that, as far as the Court can tell, DHS is

8    currently implementing the expanded expedited removal policy.

9        The hearing that I'm hoping to have today concerns the

10    second motion for preliminary injunction that plaintiffs have

11    filed.  It references many of the claims that the Court did not

12    rule on previously concerning the alleged invalidity of the

13    notice, and plaintiff seeks preliminary injunction on the basis

14    of two additional claims that were added to this case when the

15    Court authorized the plaintiffs to amend their complaint upon

16    remand from the D.C. Circuit.

17        These two new claims include the argument that the

18    July 23rd notice is invalid because it was initially issued by

19    Kevin McAleenan, who was, according to plaintiffs, not acting

20    with proper authority under the Federal Vacancies Reform Act,

21    and that Chad Wolf's subsequent ratification of that policy is

22    also invalid.

23        These are complicated arguments.  I see that you-all are

24    aware of that insofar as you designated particular counsel to

25    address them, and what I hope to do today is to start by

1    bearing down on the appointments issue to include the

2    defendants' argument -- and I think this is not necessarily

3    implicated by the new information that we just received -- the

4    argument that the Court shouldn't be addressing this claim at

5    all purportedly -- given the purportedly jurisdictional time

6    limitations in the INA.

7        Then once we sort of look at the appointments issue, I

8    wanted to proceed to discuss the merits of plaintiffs' other

9    claims, which hopefully will enable me to evaluate the

10   likelihood of success on the merits for the purpose of the PI

11   motion.  I'm not yet focused on the other aspects of the PI.

12   I'm really trying to evaluate likelihood of success.

13       Let me just ask Mr. Reuveni and Ms. Cutri-Kohart -- I'm

14   sorry if I'm mispronouncing your name -- whether the initial

15   argument concerning the time bar, is that something,

16   Mr. Reuveni, that you are going to argue or Ms. Cutri-Kohart?

17           MR. REUVENI:  I'll handle that, Your Honor.

18           THE COURT:  Okay.  So we might have to split up the

19   appointments, because I -- I take it that the government's

20   position, consistent with what you represented during our

21   planning call, was that the Court really doesn't even have

22   jurisdiction to address this appointments matter now, but --

23           MR. REUVENI:  That's -- that's right, Your Honor.

24   That is -- that is our position to address that.

25           THE COURT:  We'll talk about that.  So my hopes --

1    let me just also put the caveat on the table that we are facing

2    the constraint of being electronic, and I found recently that

3    it's difficult to engage in the kinds of exchanges that I

4    ordinarily entertain during hearings because of the time lags,

5    and people talking over each other and not being able to hear.

6    So that means that I had to scale back my level of engagement,

7    unfortunately, which might be a relief to you, but for me, it

8    means that I'll be asking fewer questions than I ordinarily do.

9    And we'll try to be mindful of the time, because there's only

10    so long that we can stare at a screen, as we're all now

11    realizing in this new reality.

12        So let's just -- let's try to have two parts of this

13    argument.  The appointments issue is part one.  The remaining

14    claims is part two.  I'll start with plaintiffs' counsel

15    addressing why the notice is invalid on appointments grounds.

16    Then we'll have defense counsel, maybe Mr. Reuveni, start to

17    explain why I shouldn't look at appointments at all, and then

18    Ms. Cutri-Kohart discussing why the plaintiffs are wrong on the

19    merits of their claim concerning appointments.  Then we will

20    move to the other -- other issue -- issues.

21        Okay.  Does that make sense?

22        All right.  So, Mr. Amdur, let me have you start -- and

23    maybe before I get directly into appointments, maybe in

24    consultation with Mr. Balakrishnan, I just want to make sure

25    that I understand the scope of the amended complaint.

1    Plaintiffs have added the two claims, but you've also added

2    allegations concerning the October 2020 implementation

3    documents, and I'm trying to figure out -- maybe this is a

4    question for you, Mr. Balakrishnan -- is there a claim that's

5    being made about the unlawfulness of the implementation

6    documents separate and apart from the notice, or are they

7    rising and falling together?  What is the import of the

8    implementation documents in the context of the claims that

9    you're making?

10              MR. BALAKRISHNAN:  Thanks, Your Honor.

11        So I think that I just want to separate sort of the --

12   your question went to all of our claims.  I just want to start

13   with, you know, the first merits issue, the -- sort of on the

14   table, which is the appointments issue.  There -- that claim

15   goes to the notice and not the implementation memo from

16   October.  So I just want to be clear about that.

17              THE COURT:  Okay.

18              MR. BALAKRISHNAN:  I think that for the remainder of

19   our claims, there's -- this sort of goes a little bit more to

20   the merits of the other claims in our preliminary injunction,

21   but our challenges are to the manner in which defendants are

22   implementing the expedited removal statute to the newly

23   designated class.  The October 2nd memo lays out the procedures

24   that they have adopted to implement the statute against our

25   class, and so the remainder of our claims do go to that

1    October 2nd memo.

2            THE COURT:  All right.  That's helpful.  And we'll

3    get back to that when we get into our part two.

4            So, Mr. Amdur.

5            MR. AMDUR:  Yes, Your Honor.  And could I just

6    clarify?  You want us to start with the merits, right, not the

7    jurisdictional question?

8            THE COURT:  You may do both.  You may do both.  So

9    why don't -- I'll have you address -- you know, ordinarily it's

10   the defendants' argument that we don't -- that I don't have

11   jurisdiction, but now they've made it.  And so will you speak

12   to the Court's ability to reach this new Appointments Clause

13   issue and the merits of that issue.

14           MR. AMDUR:  Yes.  And for -- for the jurisdictional

15   question, I'm going to pass it back to my co-counsel,

16   Mr. Balakrishnan.

17           THE COURT:  That's fine.  We're -- we're being fluid

18   here.  Mr. Balakrishnan.

19           MR. BALAKRISHNAN:  Yes, and I'll be brief on this

20   with the understanding that perhaps there will be a time to

21   reply as well, but, you know, just to lay out the framework for

22   how we believe this claim is reviewable.  We have presented

23   essentially two different theories to the Court as to why the

24   appointments claim can be amended and -- and reviewed.

25           The first goes to the specific reading of the language

1    in 1252(e)(3), which is the deadline provision pertaining to

2    systematic challenges to implementations of the expedited

3    removal system.  That provision provides that any action must

4    be filed within 60 days of the challenged writing, paraphrasing

5    slightly the statute at the end.

6         The manner -- Congress specifically chose to use the

7    word "action" there rather than writing that section

8    differently so as to state that any claim must be filed within

9    60 days of the challenged writing.  The choice of -- the choice

10   of the word "action" versus "claim" is meaningful because

11   throughout the -- throughout section 1252 of the INA, which is

12   the section pertaining generally to judicial review, Congress

13   uses both words "action" and "claim" separately, at times

14   referring specifically to limitations on the ability to raise

15   certain claims, such as nationality claims or claims under the

16   Convention against Torture.  And -- and that makes Congress's

17   choice of the word "action" in 1252(e)(3) meaningful.

18        And, you know, as we've set out in our briefs, you know,

19   the word "action" is -- is understood in the Federal Rules of

20   Civil Procedures to mean the lawsuit as opposed to the specific

21   claims raised in the lawsuit.  And, thus, under our reading of

22   the statute, because we are -- the plaintiffs filed their

23   action to challenge the designation within 60 days of it being

24   published in the *Federal Register*, there is no -- we've met the

25   requirements of (e)(3) and there's no further bar to amending

1    in additional claims.  So that's -- go ahead.

2             THE COURT:  All right.  So, Mr. Reuveni, why are they

3    wrong about that?  I mean, the statute does say "action."

4    There is a distinction between "action" and "claim," and it

5    seems as though your argument indicates that Congress intended

6    for all of the assertions that a plaintiff might make about an

7    administrative action to be made within the 60 days, which is

8    not ordinarily how time bars work, I think.  So tell me what

9    you mean.

10            MR. REUVENI:  Thank you, Your Honor.  Certainly.

11            I -- I have a response to the jurisdictional point, but

12   I also then have a -- if we're past that, a couple other

13   responses, if I may.

14            You're right that the statute, the provision here in

15   1252(e)(3), is not your usual limitations period.  It's -- as

16   Judge Sullivan's decision from 1998 and as the D.C. Circuit's

17   decision affirming that in *ALIA*, it affirms the jurisdictional

18   provision.  It's not a standard claim processing or statute of

19   limitations period.  And so just off the bat, that's the key

20   difference.

21            THE COURT:  Hasn't the Supreme Court changed its

22   standards with respect to this?  I mean, I understand *AILA* was

23   a while ago and the D.C. Circuit has revisited this notion of

24   what qualifies as the jurisdictional provision versus a claims

25   processing rule since more recent Supreme Court case law

1    concerning that issue.

2         MR. REUVENI:  So that's a fair question.  And let me

3    just point out, as I don't think we mentioned it -- either

4    party in our briefs -- the D.C. Circuit is revisiting this

5    exact issue in a case called *M.M.V. v. Barr*.  We just had

6    argument September 11th.  So we may not get a decision in time

7    for our purposes here, but that -- that same question you asked

8    me -- I was the government attorney arguing that case.  I was

9    asked that question at that argument as well, but our position

10   here is the same as it was there.

11        We think, first, no -- no Supreme Court case so clearly

12   undermines the reasoning in *AILA*.  We think, second -- there's

13   three cases we've cited, and I know you -- you may have looked

14   at Judge Mehta's decision in *Vijender* that addresses this, I

15   think, the most -- in the most detail.  But there's also

16   *Dugdale* from Judge Cooper and *M.M.V.* itself from Judge Amy

17   Berman Jackson, all of whom understand or read *AILA* as

18   affirming that it's a -- a jurisdictional provision, and that

19   entails the D.C. Circuit speaks otherwise and remands that.

20        But even if we start from first principles, under the

21   Supreme Court's more recent cases -- we cite a couple of these

22   cases in our brief -- but that it -- it seems -- and then

23   *Meijer* is a D.C. Circuit case.  There has to be some sort of

24   nexus or connection between the jurisdictional part and the

25   limitations part.  And so the jurisdiction has to be

1     conditioned -- that's the word from the Supreme Court case --

2     from the D.C. Circuit's *Meijer* decision that we cite in our

3     brief -- conditioned on that limitation period.  And I think

4     just looking at the text of 1252 itself, as Your Honor knows,

5     1252(a) says no jurisdiction unless.  And then we go to

6     1252(e), which says -- is the unless part.  And the unless part

7     in 3(a) says you can have judicial review but only of these

8     things and only if you do it within 60 days.

9         So they do appear in two different headings, (a) and

10    (b), but I don't think that's really important.  The important

11    part is what can -- if -- what the Court can do in (a) is

12    conditioned on what happens in (b).

13        THE COURT:  All right.  But can I just -- can I just

14    sort of push back in the following way.  Fine.  Even if this is

15    a jurisdictional provision, I take Mr. Balakrishnan to be

16    arguing it doesn't apply because it says any action instituted

17    must be filed.  So even if I believe you that that's a

18    jurisdictional statement, he says we've satisfied that.  We

19    filed an action within 60 days of the provision of -- of, you

20    know, the regulatory action that we are challenging.  What --

21    what is your response to that?

22        MR. REUVENI:  Well, you're going to laugh because we

23    had this same interaction at the last hearing, Your Honor, but

24    I'm going to respond with *AILA*.

25        I think *AILA* is instructive.  I think the parties

1  disagree on what happened in *AILA*, but I'd -- I'd like to point

2  out two things about *AILA*.  First, plaintiffs in *AILA* made this

3  exact argument to the D.C. Circuit.  We cite the portion of

4  their brief in our papers.  They say:  Look, you erred in

5  dismissing these new plaintiffs and these new claims because we

6  filed our action within 60 days.  And to be honest, the

7  D.C. Circuit didn't spend a whole lot of time on it.  That's a

8  fair point.  But the D.C. Circuit didn't buy that argument.  It

9  affirmed Judge Sullivan's decision in full on that point.

10      And plaintiffs would say, well, that was plaintiffs.

11  This is different.  This is claims.  And I think we disagree on

12  that because both plaintiffs raised new claims.  The new claims

13  were the provisions governing review are the -- I'm sorry --

14  the procedures available to asylum seekers are unlawful for

15  various reasons.  Those were different claims than the claims

16  that actually were timely filed, which were individuals

17  arriving at ports of entry are entitled to certain procedures

18  or rights.

19      So the D.C. Circuit, we think, forecloses that argument.

20  So it doesn't matter if they filed within 60 days.  They can't

21  just amend over and over and over.  That's not what a

22  jurisdictional limitations period is.  It is a unique

23  provision, we agree with that, but it is a jurisdictional

24  provision.  And that means, as Judge Sullivan found and as the

25  Court affirmed, it's all got to be filed within the first

1    60 days and there's good reason we think for that.

2         If I may anticipate another question, why would Congress

3    want that?  I think, again, to go back to *AILA*, Congress wanted

4    the legality of this entire new system.  Okay.  1996 Congress

5    dramatically rewrote the immigration laws, including adding

6    this new procedure never before on the books in a hundred

7    years, expedited removal.  That retained some aspects of the

8    previous system but was new in fundamental other ways, and

9    Congress wanted very quickly to have this -- is this legal or

10   is it not?  We don't -- we don't want to be litigating this for

11   the next 20 years.  We want to know upfront whether the -- this

12   is legal or not.

13        And so that's why the 60 days is jurisdictional.  And I

14   think, to use the words of *AILA*, Congress wanted this decided,

15   quote, promptly, and it's inconsistent with that goal if just

16   because you got in the courthouse door timely on day 60, then

17   on a rolling basis over the next months or years -- I mean,

18   here we are 16 months later -- an amended complaint and add new

19   complaints.

20             THE COURT:  But in all fairness, Mr. Reuveni, the way

21   the statute is written, I think it sweeps way too broadly to

22   suggest that Congress meant for all claims concerning expedited

23   removal to take place within 60 days of the initial enactment

24   in, you know, 1996.  That clearly Congress was giving the Court

25   jurisdiction to review the implementation of the expedited

1    removal policy that they were creating inasmuch as the agency

2    would be enacting new written policies concerning that

3    practice.  And so at a minimum, the 60 days permits people to

4    bring actions related to new written policies of the agency

5    that implement aspects of the expedited removal process.

6         I mean, I think that's -- I don't -- I don't know that

7    that's a controversial proposition.  We're not slamming the

8    door on anything just because it's not within 60 days of the

9    initial enactment of expedited removal, but let me ask you

10   this:  If I disagree with your jurisdictional characterization,

11   do you lose?  Does your argument turn on whether or not I agree

12   with jurisdiction or not?  What if I say it's a claims

13   processing rule?  Do you lose automatically just based on that

14   finding?

15        MR. REUVENI:  No, Your Honor, but before -- before I

16   answer that, let me just put a pin in that because we have

17   different jurisdictional arguments for the other claims, but I

18   don't want to distract from the focus right now.  So I'll come

19   back to those later when we talk about those claims, unless the

20   Court wants to hear on those now.  I don't think it does.

21        THE COURT:  No, we'll talk about them at the relevant

22   time.

23        MR. REUVENI:  Yeah.  So -- so, no, I don't think we

24   lose.  Even assuming that it's not jurisdictional and that you

25   disagree that *AILA* says it is or you think it's eroded by

1    subsequent cases, however we get there, there's still two other

2    problems for plaintiffs.

3        Just because they filed their action timely doesn't mean

4    the new claims relate back.  Like, they still have to show that

5    the initial complaint they filed or the one that was the

6    operative complaint that was timely filed -- but I think here

7    that would be the September 20th, 2019, complaint -- put the

8    government on notice that they have these other claims that

9    they could be raising.  This gets into a portion of the brief

10   on the D.C. Circuit's decision in *Jones* -- and I'm probably

11   mispronouncing this, but it's M-e-i-j-e-r.  It's a 2008 case we

12   also cite, *Meijer*.

13       Both of those cases dealt with similar -- different

14   provision, of course, not 1252(e)(3), but similar provisions

15   that say filing the action within a set period of time.  One

16   was the antitrust laws, and another was a discrimination

17   statute; but those are just two examples.  There's many, many,

18   many in the federal code that use the word "action" in the same

19   way as (e)(3) does.

20       And the analysis is as follows:  Look, if you filed your

21   action timely, that's fine.  Your new claim still has to relate

22   back under Rule 15(c), and to make that showing, you have to

23   point to something in your operative complaint that was timely

24   filed that fairly puts the government on notice that this is a

25   claim.

1              And -- and we've laid it out in our brief, both for

2       Claim 7 and 8, but focusing on Claim 7 here, they just haven't

3       done that.  There's nothing in the complaint that says anything

4       about Acting Secretary McAleenan's authority to issue this

5       because he was not duly authorized at the time to do so.

6       There's nothing in the complaint on that.

7              And I -- I think anticipating the tolling argument, I --

8       if we get to that because it's a claim processing rule in your

9       estimation, Your Honor, as Your Honor knows, there's another

10      case related to this case, *Centro*, Docket 19-2840, also filed

11      by the day-60 deadline.  It's September 20th, 2019.  That's

12      sort of taken a backseat to this case because this one -- we

13      moved quickly in this one, had the injunction in this one, and

14      they filed timely at paragraphs 312 to 320.  And, specifically,

15      paragraph 316 of that complaint, they allege that secretary --

16      or Acting Secretary McAleenan was not authorize to perform the

17      roles of his position both for Appointments Clause reasons and

18      under the FVRA.

19              THE COURT:  But what do we do about the fact that

20      this case was under appeal at a time in which they could have

21      raised this claim?  In other words, are you holding them to

22      the -- the claims in this case to a sort of impossible standard

23      with respect to amending their complaint timely because, for

24      all intents and purposes, they were -- you know, at the time

25      that these kinds of arguments were being raised in other courts

```
1    and recognized, this case was at the D.C. Circuit?

2            MR. REUVENI:  So, no, I don't think so, and here's

3    why.  If we're talking about relate back or past jurisdiction,

4    it -- it -- they can relate back years after the fact so long

5    as there's actual notice in the operative complaint that this

6    is a claim that arises from the same nexus of events that

7    fairly puts the government on notice.  So I don't think the

8    appeal matters as all.  If -- if there was something in their

9    September 20th complaint that put us fairly on notice, they can

10   come back 15 months later after the -- the appeal is resolved

11   and say it relates back.

12           THE COURT:  But it seems a little weird, though,

13   Mr. Reuveni -- I mean, why isn't the mention of McAleenan in

14   the initial complaint enough?  If you're asking them to have

15   put something in the initial complaint that suggests that

16   McAleenan's appointment was unlawful, you're basically asking

17   them to have made the claim upfront.  They say -- or, you know,

18   could say:  In my original complaint, I say this official, you

19   know, issued this notice and I'm claiming that this notice is

20   invalid.

21           MR. REUVENI:  That's -- Your Honor, I think two --

22   two responses to that.  Just on the specific hypothetical,

23   that's a very different claim.  And as -- as Your Honor knows,

24   that's what the injunction was premised on.  The notice was

25   invalid in the Court's view because it didn't go through notice
```

1    and comment.  It didn't adequately explain itself.

2         There was also a number of statutory authority points

3    they made that they repeat here that we'll get to later that

4    the notice didn't provide fair procedures or it doesn't provide

5    a right to counsel, and the statute is -- does not require

6    that.  Those were in the operative complaint.

7         This idea that Secretary McAleenan didn't have the

8    authority is nowhere in there.  And I think it's the general

9    point, if you're going to say just mentioning McAleenan is

10   enough and this was unlawful, that means any complaint, any

11   claim later relates back just because you said the magic words

12   McAleenan or any government official that -- whose actions

13   they're challenging.

14        And under *Jones* and under other D.C. Circuit cases

15   we've -- we referred the Court to on -- on this, that's --

16   that's far, far from enough.  You have to actually have some

17   arguable notice.  And I think we pointed out in our brief

18   actually the contrary, I think.  We -- the government was put

19   on notice that they weren't making this claim because they said

20   the Secretary has authority under 1225(b)(1)(A)(iii) to do

21   this.  And nowhere in there, nowhere in any of the paragraphs

22   in the operative complaint that discussed the authority was

23   this even remotely hinted at.  So they --

24             THE COURT:  Let me -- let me ask Mr. Balakrishnan to

25   respond.  I understand plaintiffs' jurisdictional argument, but

```
1    assuming it's not jurisdictional as plaintiffs argue,

2    Mr. Reuveni is saying, nevertheless, the government still wins

3    because of this relation back or whatever else.  So what's your

4    response to that?

5              MR. BALAKRISHNAN:  I want to address Your Honor's

6    question.  I just want to make sure one thing is clear before I

7    do so, which is that, you know, I -- I began by talking about

8    our first argument as to why we can amend this claim.  That

9    argument -- you know, it doesn't turn on whether the statute is

10   jurisdictional or not.  In either way, what the Court is

11   looking at is the plain text of 1252(e)(3) and its reference to

12   action.  And so it doesn't turn on whether it's jurisdictional

13   or not, because in either case we would have met the

14   requirements.

15        And before I move on, I just want to say one quick point

16   about AILA, which is that, you know, AILA couldn't have

17   considered this issue and -- nor has any other court considered

18   this issue, because this is an issue of plaintiffs who had

19   standing when they filed their initial action who have standing

20   to raise the amended claim at a later point in time.  That's

21   what our case is.

22        In AILA, it's very different.  They were adding new

23   plaintiffs.  It wasn't a question of the original plaintiffs

24   having new claims over which the original claims had standing,

25   and I think that is a distinction with a difference.  Because
```

1    if you're seeking to join new plaintiffs to an already filed

2    lawsuit or to intervene new plaintiffs, those plaintiffs still

3    must meet the basic -- both Article III, you know, standing, as

4    well as any sort of statutory requirements that constrain the

5    Court's ability to hear a case.

6          And so in *AILA*, the new plaintiffs were essentially held

7    to the same standards that their action must be filed within 60

8    days; moreover, their injury, because they had only been placed

9    in expedited removal after the 60 days, had -- you know, had

10   already fallen outside of the 60-day window.  So, you know, for

11   those reasons, *AILA* could not have addressed this question, and

12   its reasoning is inapposite.

13         But I want to move on to address the question Your Honor

14   actually asked, which is about assuming that the -- the statute

15   is not jurisdictional and we read (e)(3)(E) as a claims

16   processing rule, why are we able to amend in our claim -- our

17   appointments claim at this point?  And there we have not relied

18   on relation back in our -- in our pleadings.  We have, instead,

19   explained that the statute, if it's a claim processing rule,

20   should allow for equitable tolling in order to raise this

21   claim.  And the statute, you know, doesn't contain any language

22   to overcome the presumption that every claims processing rule,

23   you know, includes the background common law doctrine of

24   equitable tolling.

25                THE COURT:  So how does it work in this situation?

1    What are you asking to be tolled?  When does this clock start?

2             MR. BALAKRISHNAN:  Yeah.  And so here -- you know,

3    there's two things, which is, first, when we and the public

4    knew about the factual underpinnings of the illegality of

5    McAleenan's succession -- and I don't want to go into too many

6    details.  I think my colleague Spencer Amdur is in a better

7    position to talk about the specific facts, when they were known

8    and what was, you know, essential for us to be able to properly

9    plead the claims that we're actually presenting at this time.

10   So the first part is when were the facts known.

11            The second part is did we move with reasonable diligence

12   after learning those facts.  And as Mr. Amdur will explain,

13   those facts were known in November of 2019, you know, near --

14   either -- you know, near or around the time this Court entered

15   a stay on agreement of the parties pending appeal of -- you

16   know, of the original preliminary injunction.  At that point

17   the case was stayed.  On appeal were the questions of not only

18   the merits of the preliminary injunction but also questions

19   going to plaintiffs' standing and the Court's jurisdiction to

20   hear, you know, any of the claims in the first instance.

21            We moved expeditiously after the mandate issued to amend

22   our complaint and add the new claim at that time.  I think the

23   Supreme Court has been clear in cases like *Holland* that, you

24   know, the test is one of reasonable diligence, and it's to be

25   assessed in a case-specific manner.  And within the context of

1  this case, the proceedings, the stay and the pendency of the

2  appeal, you know, we acted with reasonable diligence in raising

3  the claim when we did.  And --

4         THE COURT:  So I think -- I think at this point, let

5  me pivot to Mr. Amdur and then we'll let Mr. Reuveni and maybe

6  Ms. Cutri-Kohart respond; okay?

7         Mr. Amdur.

8         MR. AMDUR:  Thank you, Your Honor.

9         Yes.  So to -- to address the equitable tolling question

10  here for this claim, you know, the Court reasoned that

11  equitable tolling is appropriate here is that at the time

12  plaintiffs filed this case, there was -- they had no reason to

13  know that Defendant McAleenan was serving invalidly for the

14  reasons alleged in this claim.

15         Until November 2019, both of the core documents that --

16  that formed the basis for this claim were not public yet, and

17  that's the April Nielsen order and the latest version of the

18  Delegation 106 from April 10th.  Those documents didn't become

19  public until November 2019.  And so before that, there was just

20  no reason to -- to think or even to suspect that McAleenan was

21  serving in violation of the DHS's own internal succession

22  rules.  You know, we typically assume that agencies follow

23  their own rules.

24         You know, once that information became public and as

25  soon as the stay was lifted in this case, plaintiffs moved

1    immediately to amend in this claim, as my colleague just

2    explained.

3              THE COURT:  Let me just be clear about what you're

4    suggesting with respect to the facts.  Obviously everyone knew

5    that McAleenan had been appointed as the Acting Secretary, but

6    what I hear you now suggesting is that what you didn't know was

7    that the agency had allegedly invalidly amended the line of

8    succession to allow him to be the acting.  The authority for

9    which he could take over as acting was not made public until

10   November, at which point it became clear that it was not valid

11   in the plaintiffs' view?

12             MR. AMDUR:  That's right, Your Honor.  That -- you

13   know, the way -- I guess the way I would put it is that the --

14   the agency's succession rules as they stood on the date that --

15   that Defendant McAleenan took over on April 10th, the state of

16   those succession rules was not made public at the time that we

17   filed this case.

18             And -- and -- and, you know, the -- those -- those

19   really are the -- the key basis of this whole claim.  I mean,

20   as you see from the briefs, it's all about Delegation 106 and

21   the Nielsen order.  I mean, that's this whole claim.  And, you

22   know, the government hasn't cited anything to suggest that that

23   was, you know, publicly available and in circulation before

24   November, which is when -- you know, November is when the

25   reporting happened, it's when the House, you know, attached

1    those documents to its -- its public letter.

2         THE COURT:  So I'm sorry.  The delegation --

3    Jeh Johnson's delegation was not even public, you're saying?

4         MR. AMDUR:  I'm saying that Revision 8.5, which was

5    in effect on April 10th that incorporated the Nielsen order --

6         THE COURT:  Yes.

7         MR. AMDUR:  -- that -- that was the governing

8    document that, you know, consolidated all of the current DHS

9    succession rules.  Revision 8.5 of Delegation 106, that -- and

10   the Nielsen order are what came out in November.

11        And if I could just quickly respond because, I mean, the

12   government has suggested otherwise in a couple ways now, but if

13   you actually look at what they're pointing you to, they

14   don't -- they don't raise these documents or this particular

15   problem.  One is the -- the complaint that government's counsel

16   just mentioned from September 2019.  It doesn't raise this

17   claim.  It doesn't cite to either of those documents, which

18   weren't out yet.  It makes a completely different argument

19   about why McAleenan's service was -- was invalid.  And so

20   that -- that --

21             (Indiscernible simultaneous cross-talk.)

22        THE COURT:  The *Centro* complaint you're talking

23   about, that -- that Mr. Reuveni mentioned?

24        MR. AMDUR:  Exactly.  So I'm looking at it right now.

25   And paragraph 319 describes its -- its claim against

1    McAleenan's appointment.  And it says -- the claim is the

2    President, quote, intends for Defendant McAleenan to perform

3    the functions and duties of the Secretary of DHS indefinitely.

4    It's a claim about a purported intent to have him serve

5    indefinitely.  It doesn't even -- the whole complaint doesn't

6    even mention the two documents that are the basis for our

7    claim.

8         You know, the other thing they cite in their brief is a

9    blog post from April.  That blog post, you know, it's

10   time-stamped 6:00 a.m. on April 9th.  It comes before either of

11   the documents at issue in this case were issued.  It doesn't

12   mention either of them.  It doesn't raise this reason for his

13   service being illegal.  You know, and so I think one other

14   indication that is -- is important to point out for why

15   equitable tolling is appropriate here, every case that we've

16   looked at that raises the same claim as ours, they all raise

17   this after November 2019.  So that's really when this issue

18   came to light.

19        And in all of those cases, you know, if the case was

20   already pending, the judge permitted the plaintiffs to amend in

21   the claim after November.  The other cases weren't filed at all

22   until, again, either after November or after the GAO reached

23   its decision in -- in August of 2020.

24        THE COURT:  All right.  Let me move you to the

25   merits, and then I will allow defense to respond, both to your

1   equitable tolling points and the merits points that you're

2   about to make.

3           MR. AMDUR:  Absolutely, Your Honor.

4           The merits of our claim, as Your Honor knows, are --

5   the -- the core of the merits are simple, which is that

6   McAleenan lacked authority to issue the rule in this case

7   because at the time he purported to take over, DHS's internal

8   succession rules did not make him the Acting Secretary.  That's

9   how every single court that's reviewed these same rules has

10  read them.  They've all held that the rules are clear on their

11  face and that they did not make McAleenan the Acting Secretary.

12          And then, of course, I can put it to the side now,

13  unless Your Honor would like to go into it, but ratification is

14  also barred here for a number of reasons.  It's -- it's

15  categorically barred by section 3348 of the Vacancies Act, and

16  that would bar it in any event, even if the government takes

17  some new action now to rectify the mistake that counsel raised.

18          THE COURT:  But let me ask you:  Doesn't that

19  particular line of reasoning with respect to the categorical

20  bar require the Court to make an assessment of whether or not

21  the functions and duties are nondelegatable under the statute,

22  and, if so, how do I go about figuring that out?

23          MR. AMDUR:  So, yes, it would require the

24  determination about whether this -- this particular duty counts

25  as a function or duty.  We -- we submit that it clearly does

1      for a number of reasons.  I mean, you know, as -- as Judge Moss

2      explained in the -- the *L.M.-M.* decision, functions or duties

3      have to include functions that are specifically assigned to one

4      particular office and that office alone.  And here this

5      function of designating expedited removal is placed in the

6      Secretary's, quote, sole and unreviewable discretion.

7            And as the D.C. Circuit just explained that provision,

8      that means that there is, quote, one decision-maker and one

9      decision-maker alone.  So, I mean, that's just uniquely

10     emphatic language placing this decision in the hands of -- of

11     the Office of the Secretary.  And so we think that plainly

12     satisfies the -- the -- the definition of function or duty,

13     because the Secretary is the only one who can have

14     responsibility for it.

15            THE COURT:  All right.  Let me just make sure I don't

16     have any other questions before I turn it to over to -- so let

17     me ask the broader question, and this might require more

18     consultation.  If I agree with you on your two simple points,

19     McAleenan lacked authority and Wolf didn't validly ratify the

20     notice, do I need to reach any of the other claims for the

21     purposes of preliminary injunction or can I enjoin the notice

22     on that grounds alone and that's it?

23            MR. AMDUR:  That's -- that's it, Your Honor.  That --

24     I think if -- if -- those two issues would resolve -- would

25     resolve this claim and be sufficient to enjoin the rule.

 1          THE COURT:  All right.  Mr. Reuveni and

 2    Ms. Cutri-Kohart.

 3          MR. REUVENI:  Thank you.  Thank you, Your Honor.

 4    I'll just briefly respond on the tolling point and then I will

 5    pass -- pass it over to my co-counsel.

 6          Just really quickly on the tolling point.  I -- I -- I

 7    don't think their focus on the two documents and the time they

 8    were noted to the public in November -- the -- the case was

 9    stayed at the time -- is really the relevant operative time to

10    be looking at.  And I think it's instructive that elsewhere in

11    the brief they argue that what should have governed succession

12    here was Executive Order 13753 signed by President Obama in

13    December of 2016.  And that's where this news article and blog

14    post we refer to comes in, because this is a law professor

15    familiar with these issues, Mr. Vladeck, noting that there

16    should have been at least four people, before secretary

17    McAleenan -- then Acting Secretary McAleenan, who were in line

18    for this position.  So as of April --

19          THE COURT:  That assumes that the executive order was

20    not displayed.  I mean, isn't -- doesn't -- under the -- FVRA,

21    if I have the acronym correctly, couldn't the Secretary make a

22    succession claim that veered from what the FVRA was and

23    presumably even veered from what the executive order was?  In

24    fact, the executive order was only applicable because prior to

25    all of this, it appeared as though the Secretary had adopted

1  the executive order.  Do you understand what I'm saying?

2       So it can't really be that the fact that McAleenan was

3  not appropriate under the executive order was sufficient to

4  give the public notice that McAleenan was not valid under these

5  circumstances because there very well could have been other

6  authority issued by the Secretary that had not yet been made

7  public.

8       MR. REUVENI:  It's a -- a -- essentially I have an

9  answer for, but I don't want to get too much into the merits,

10  because that's my co-counselor's domain.  So I don't want to

11  step on her toes there.

12       But I -- I think the point just for tolling purposes is,

13  yes, that may all well have been true.  There may have been

14  something behind the scenes, but what was known to the public

15  was this executive order.  And McAleenan was number five under

16  that order.  That's what was known to the public.  So right

17  away, someone who wants to make this claim knows April 9th and

18  April 10th, 2019, something is not -- not right here, if this

19  is, you know, sophisticated actors following government's

20  Appointments Clause issues.

21       I think looking at November and then later the

22  amendments and the other cases that -- that counsel for

23  plaintiffs references and this GAO report, I mean, that's all

24  true.  That all happened.  That all came out later, but as

25  we -- we point out in our briefs, the fact that the law has

1    changed or has become more favorable for you after you filed

2    your complaint isn't really a reason to explain why you didn't

3    act -- you did or didn't act diligently in making the claim

4    when you could have.

5              THE COURT:  Can I ask you a question, Mr. Reuveni,

6    because you've argued a number of these cases on behalf of the

7    agency in this realm.  Were there other acts of McAleenan that

8    were challenged before November on this ground?  Because,

9    presumably, the executive order wasn't just with respect to

10   expedited removal designation, but it was with respect to the

11   duties and functions of the Secretary.

12             And so McAleenan comes in in April.  And if your point

13   is that the executive order would have put the public on notice

14   that McAleenan was inappropriate, were there other cases in

15   which that claim was being made prior to the -- the release of

16   Secretary Nielsen's attempted amendment?

17             MR. REUVENI:  So in answer, that is not fully an

18   answer just for the 1252(e)(3) realm -- and then I'll pass it

19   over to my co-counsel, because she will probably have a better

20   answer for you on the bigger picture on that.

21             But there were -- there's two cases.  Of course, there's

22   the case pending, *Centro*.  And I think my -- my co-counsel --

23   or counsel on the other side is -- is wrong to just focus

24   myopically on paragraph 319.  I mean, there's allegations here

25   that something was amiss and that they -- that the FVRA

1    requires action X, but something other than action X occurred.

2    And this is paragraphs 313 to 320, and they filed this

3    untimely.  And I guess to accept plaintiffs' argument, you have

4    to accept that it was reasonable for them to wait two

5    additional months and then the stay comes in, and then not

6    amend their complaint until the case comes back 12, 13 months

7    later.  You know, we don't think that satisfies tolling, but

8    we've argued about that.  I can move on from that point.

9         I think there are other examples that aren't specific to

10   McAleenan.  There's, of course, the case before Judge Moss, the

11   *L.M.-M.,* that involved Mr. Cuccinelli.  It's not McAleenan

12   directly himself, but it involves similar sorts of allegations

13   that under publicly known rules of succession course X should

14   have happened, but somehow Mr. Cuccinelli is in charge and

15   something's wrong with that.  And those cases were under

16   1252(e)(3) -- for that case, I should say, and was timely filed

17   within 60 days with that claim.

18        With that I -- I pass it over to my co-counsel.  She'll

19   have more information and can address the merits on it.

20             THE COURT:  All right.  Good morning,

21   Ms. Cutri-Kohart.

22             MS. CUTRI-KOHART:  Good morning, Your Honor.

23        I think that my co-counsel conveyed the -- the correct

24   sequence of events.  My memory of the earliest case that our

25   office dealt with is the *A.B.-B.* case in front of Judge Leon.

1    I believe it was filed before the GAO report but after

2    November 2019 -- 2019.  I just -- I just can't tell you the

3    date off the top of my head.  Sometime in winter of 2020.

4         That said, there was contemporaneous reporting, such as

5    the blog post we cited, when McAleenan began his acting service

6    commenting that it was out of order from the publicly known

7    executive order that had been in place since 2016.  Although

8    the -- the exact details of the alleged deficiency here were

9    not public at the time, I think that that -- that put the --

10   the public on notice that there was potentially -- potentially

11   an issue that could be inquired about.  So the -- but it is

12   true, to the best of our ability, to -- to discern the -- the

13   Delegation 106 Revision 8.5 did not -- did not get made public

14   until later.

15        THE COURT:  All right.  Can you speak then to -- with

16   an understanding that the government is going to revisit its

17   ratification argument, is the government conceding the

18   plaintiffs' point with respect to the merits of their assertion

19   that McAleenan was inappropriately or unlawfully appointed?

20        MS. CUTRI-KOHART:  No, Your Honor.  We believe that

21   the plain text reading of Secretary Nielsen's order of

22   April 2019 supports the notion that she amended the order of

23   succession without qualification.  In that order, if you -- if

24   you look at it -- we filed it as Exhibit No. 1 to the Blackwell

25   declaration -- she invokes the Homeland Security Act Provision

1    113(g)(2), which is her authority to set the order of

2    succession, three times, and then five times she states that

3    she is setting an order of succession.

4        Plaintiffs' proposed reading is that -- is that part

5    II.B. of an internal DHS administrative document that refers to

6    limitations on a delegation of authority, that those

7    limitations should also be placed on the order of succession,

8    but orders of delegation and orders of succession are

9    different.  When Secretary Nielsen amended Annex A, Annex A had

10   previously been just an order of delegation.  Her amendment

11   turned Annex A into both an order of succession and an order of

12   delegation.  And II.B.'s limitation only -- only applies to the

13   delegation portion of that.

14       I think plaintiffs fail to acknowledge there's a

15   difference between a succession and delegation, and it would be

16   contrary to a plain reading of what Secretary Nielsen did under

17   her authority of the order -- the order of succession to limit

18   that authority based on a preexisting limit to an order of

19   delegation.

20            THE COURT:  All right.  But in all fairness, it's not

21   just plaintiffs; right?  I mean, we have several courts now

22   that have accepted the view that by the plain text of the

23   amendment that Secretary Nielsen put forward, she was amending

24   Annex A by striking the text of that in entirety and inserting

25   the following, at which point she inserts into Annex A a list

1    of people who she says are to be the order for delegation of

2    authority by the Secretary, and, of course, when we look at

3    Annex A, that annex itself is limited.  It's limited to

4    officials who are authorized to occupy the identified positions

5    in the event that the Secretary's unavailable during a disaster

6    or catastrophic emergency.

7         So I'm -- I guess I'm confused as to why I'm to assume

8    that the Secretary was intending to displace the entirety of

9    this section II which bifurcates the succession as between

10   people who are following along if the Secretary dies, resigns,

11   or is unable to perform, which is subpart A.  And Annex A,

12   which is subpart B -- and I'm referring to the Delegation 106,

13   which indicates who is supposed to follow in case of a disaster

14   or catastrophic emergency.  It seems like the government is

15   requiring the Court to infer quite a bit when that's not what

16   Secretary Nielsen actually said.

17        MS. CUTRI-KOHART:  So what Secretary Nielsen said was

18   that she wanted to amend Annex A to be an order of succession.

19   I think it's pretty clear in that April 2019 order that she

20   signed that she was designating an order of succession.

21        Previously Annex A was an order of delegation.  And if

22   you look at II.B., so the -- the portion that talks about a

23   disaster or a catastrophic emergency, it clearly discusses the

24   bifurcated side of a delegation.  The first phrase in II.B. is

25   I hereby delegate authority.  And then, you know, it goes on,

1    and it says in the event that I am unavailable to act during a

2    disaster or emergency.  II.A. which was the preexisting order

3    of succession under the executive order didn't have any such

4    limitation in it.

5           THE COURT:  I understand, but can I -- can I just ask

6    you, if you're right that Annex A was supposed to be coming in

7    order of succession, which you distinguish from an order of

8    delegation, even if I accept that, what do I do with II.A. of

9    Delegation 106?  Because that too talks about succession.  So

10   now we just have two different paragraphs pertaining to the

11   orderly succession; right?

12          MS. CUTRI-KOHART:  I think this is where -- where

13   Delegation 106 Revision 8.5 is erroneous in how it implemented

14   what the Secretary actually signed.  And I think we need to go

15   back to what the Secretary herself signed because she is the

16   only one who has the authority to change the order of

17   succession.  An administrative document can't overrule the --

18   the express order of the Secretary, and II.A. should no longer

19   be there because it's been superseded by the order of

20   succession that she set in her April 2019 order.

21          THE COURT:  All right.  I don't know if I'm looking

22   at her order or not, but is there language in her order that

23   says II.A. is gone?

24          MS. CUTRI-KOHART:  The language of her order that

25   says that she is setting an order of succession by its own

1   terms overrides a preexisting order of succession.  She invokes

2   her statutory authority.  In 113 she chooses to set a new order

3   of succession.  So a preexisting order would no longer be

4   valid.

5         THE COURT:  All right.  So given that the government

6   has made this same argument unsuccessfully with at least, I

7   think, two other courts -- maybe I have it wrong -- is it

8   argument those other cases are just wrong?

9         MS. CUTRI-KOHART:  Yes, Your Honor.  The two other

10  district courts, one in Maryland and one in the Northern

11  District of California, neither of those courts really grappled

12  with the bifurcation between an order of succession and order

13  of delegation.  And I think that that is where those decisions

14  went wrong.

15        THE COURT:  All right.  I understand that argument.

16  Let me -- I'm mindful of the time, and I want to just now

17  understand the implications of the new information that you

18  raised this morning.

19        So my understanding of what the plaintiff has argued

20  about ratification is, first, that there is no ratification

21  under -- as a categorical matter under the express terms of the

22  statute, and that doesn't seem to turn on whether or not

23  Mr. Gaynor validly passed the baton to Chad Wolf, but they also

24  make the argument that is -- pertains to what Judge Moss found;

25  that Gaynor -- that Gaynor as an Acting Secretary could not

1   change the order of succession in a manner that allowed for

2   Chad Wolf to come on board as the Acting Secretary.

3        Is that argument implicated now by the timing issue that

4   you pointed out, and, if so, how so?  I know you're going to

5   write something about it.  So I'm not holding you to this.  But

6   I'm just trying to understand where the new information comes

7   in in the analysis?

8        MS. CUTRI-KOHART:  So, Your Honor, let's -- let's

9   talk about whether this is categorically bar for ratification

10  first.  Because I agree with plaintiffs that that issue is kind

11  of independent of this new issue that I raised.

12       If you look at the text of the FVRA 3348(a)(2), it says

13  ratification is barred when it's a function or duty, and it

14  narrowly defines function or duties as those that must be

15  performed by the applicable officer, and then the language of

16  the statute says and only that officer.

17       And so courts, the Senate, the GAO have all interpreted

18  the phrase "only that officer" to -- to mean the function is

19  nondelegatable, meaning no other person can perform the duties.

20  What plaintiffs attempt to do here is take the language in the

21  statute that says something is in the sole discretion of the

22  Secretary to mean that that is -- that function or duty cannot

23  be performed by only that officer, but that simply is not the

24  case.

25       Though I couldn't find any D.C. Circuit precedent, both

1    the Ninth Circuit and the Fifth Circuit has interpreted sole

2    discretion language to find that -- to define that the duty is

3    still delegatable.

4        I would point the Court to *Inland Empire Public Lands*,

5    88 F.3d 697, where there was a function that was in the sole

6    discretion of the Secretary of Agriculture, and the Ninth

7    Circuit held that could still be delegated to the Chief of the

8    Forest Service.  Sole discretion has to do with the

9    reviewability of the function, not whether the Secretary can

10   delegate the function to other people.

11       We point to two sources of authority in our brief that

12   shows the Secretary can and, indeed, did delegate the function

13   of -- of setting the scope -- designating the scope of

14   expedited removal.  One is a long-standing delegation to the

15   Deputy Secretary, and, yes, it is a very broad delegation.

16   It's in Blackwell -- the Blackwell declaration, Exhibit 5, that

17   allows the Deputy Secretary to exercise the power to make rules

18   and regulations and the like.  And, in fact, Judge Moss relied

19   on this delegation in finding something was not the function or

20   duty of the Office of the Secretary in his decision in the

21   *Northwest Immigrant Rights Project*.

22       Additionally, there's a C.F.R., 8 C.F.R. 235.3, that

23   specifically acknowledges this designation authority can be

24   delegated to other officials, such as the ICE director or the

25   CBP commissioner.  And so there's -- there's pretty good basis

1   to support the notions it's not a function or duty and it is

2   not just the Secretary that must perform this function; simply,

3   that it is in his sole discretion and it is unreviewable.

4           THE COURT:  All right.  I understand that point.  So

5   that leaves then this other argument that Judge Moss was at

6   least persuaded by, which is even the nondelegatable -- or the

7   delegatable duties are such that it's not a function or a duty

8   of the officer, can't be undertaken by someone who isn't

9   validly installed and Gaynor did not have the authority to give

10  Acting Secretary responsibilities to Wolf.

11          Is this one that's -- so your argument may be -- and let

12  me just -- let me just try to play around here in my mind with

13  what you said.  Your argument is as a factual matter he may not

14  have because of the timing?

15          MS. CUTRI-KOHART:  That's correct, Your Honor.  We

16  still need to consider the timing and whether in this kind of

17  hypothetical universe, Gaynor became the Acting Secretary when

18  the Wolf nomination was submitted.

19          As I said principally, we still believe that Wolf was

20  validly serving all along by the order of succession set by

21  McAleenan, but this was an attempt to cure any deficiencies

22  under the theories that plaintiffs in this and other cases had

23  advanced.  But, yes, as we consider the timing, we'll have to

24  revisit that argument.

25          But assuming for a moment that Gaynor was a properly

1    serving Acting Secretary, we believe that the decision in the

2    *Northwest Immigrant Rights Project* was erroneous because it was

3    contrary to the D.C. Circuit precedent *In re Grand Jury*.

4    Although Judge Moss expressed his belief that the Acting

5    Secretary could not -- could not set an order of succession

6    because the Homeland Security Act gives the authority to just

7    the Secretary without specifying that the authority is also

8    statutorily granted to the Acting Secretary, *In re Grand Jury*

9    makes clear that the acting officer becomes the head of the

10   department when they're acting in that capacity and is vested

11   with the same authority as that head of the department or the

12   officer for whom he acts.  There's no exceptions to that or --

13            (Indiscernible simultaneous cross-talk.)

14            THE COURT:  But -- but is *In re Grand Jury* in the

15   context of succession plans, or are they talking about other

16   things that people are doing as Acting Secretary?

17            MS. CUTRI-KOHART:  So in that case, I believe the

18   case was about appointing a special counsel and the person was

19   acting as attorney general for that purpose.

20            THE COURT:  Right.  And isn't Judge Moss's concern

21   that the whole vacancy scenario is different; that -- that if

22   you allow for acting people to change the line of succession,

23   that you totally undermine the Congress's clear intent which

24   was to put limits on the ability of the Executive Branch and

25   its officers to continue to fill these otherwise senatorial,

1    you know, required, approved people with acting people.

2         That, in other words, it's hard to take a line of cases

3    and reasoning that apply to duties that don't have to do with

4    vacancies and appointments and plop it in here where there are

5    specific concerns of Congress about allowing people to succeed

6    one another in this way.

7         MS. CUTRI-KOHART:  So, first of all, the President

8    would still have the full authority to remove the Acting

9    Secretary.  So there's not a situation in which -- in which you

10   have kind of an agency that just keeps amending its line and

11   the executive loses control.

12        THE COURT:  But that wasn't the concern of the

13   Vacancies Act.  The concern was not that the executive or the

14   President loses control.  The concern was that Congress no

15   longer had oversight that -- you know, that the oversight that

16   the Constitution requires with respect to approving these

17   agency heads.  And that could happen, I think, under the

18   government's proposed reading of this.

19        MS. CUTRI-KOHART:  Well, Your Honor, though this is

20   an interpretation of the Homeland Security Act, I think it's

21   important to note the very same sequence of events could occur

22   in some cases even under the Federal Vacancies Reform Act.  The

23   first provision of the Federal Vacancies Reform Act allows for

24   automatic service of the first assistant to serve as acting.

25   In some cases, the first assistant is defined by statute, but

1   in the vast majority of the cases, the first assistant is

2   defined by internal agency regulations or even internal agency

3   documents.

4       And in that situation as well, the acting officer would

5   have the authority to change -- you know, exercising the same

6   authority as the office, change those internal agency

7   regulations, and redefine who the first assistant is.  Whether

8   this is a bug or a feature, Your Honor, I don't want to comment

9   on, but -- but Congress could correct that by changing either

10  of these two statutes.

11      THE COURT:  Can I ask you one more question, and then

12  I'd like to take a brief break -- I'm going to let Mr. Amdur

13  respond, and then we'll take a break before we shift gears to

14  the rest of the complaint.

15      You said at one point in your argument that the

16  government still maintains that Chad Wolf was validly installed

17  through the line of succession that comes from McAleenan.  Can

18  you just flesh that out a little bit?  So when McAleenan came

19  in, assuming he was valid, did he change the line of succession

20  such that it got to Chad Wolf?

21      MS. CUTRI-KOHART:  Yes, Your Honor.  Before McAleenan

22  left office, he exercised his authority under the Homeland

23  Security Act to change the line of succession again.  He placed

24  Chad Wolf, who was an undersecretary, fourth in line of

25  succession, which would have -- since the three above him were

1   vacant, that would have put him next in line in succession when

2   McAleenan resigned.

3           THE COURT:  I see.  All right.  Is there anything

4   more you want to say before I turn it over to Mr. Amdur?

5           MS. CUTRI-KOHART:  Yeah, I do want to make one more

6   point regarding Judge Moss's reasoning in the *Northwest*

7   *Immigrant Rights Project*.  Part of Judge Moss's reasoning was

8   based on his concern that sitting acting secretaries was an

9   appointment of an inferior officer.  We don't think that

10  that -- that aligns with what an acting designation is.

11       There's a Supreme Court case, *Weiss*, 510 U.S. 172, that

12  basically says when Congress intends to use the language of

13  appointment, it will use it in statutes.  And in neither the

14  Homeland Security Act nor the FVRA does Congress describe

15  acting service as an appointment; that they describe it as the

16  ability to perform the functions or the duties of a vacant

17  office.

18          THE COURT:  All right.  Thank you.

19      Mr. Amdur.

20          MR. AMDUR:  Thank you, Your Honor.

21      I'll just make a couple very quick points in response

22  about ratification.  You know, I don't have much to add on

23  the -- the Gaynor theory that -- you know, that is in Judge

24  Moss's opinion.  I'd just say, you know, all the arguments the

25  government is making in this case about that question were made

1    to Judge Moss, and we agree with his reasons for rejecting

2    them.

3         Turning just to the -- the question of whether this is a

4    function or duty of the Secretary, I do want to just zero in

5    on -- on the unique language in this statute, because it

6    doesn't just say that this is in the Secretary's sole

7    discretion.  It says sole and unreviewable discretion, and --

8    and that's a unique phrase.  That doesn't appear very often in

9    U.S. Code.

10        THE COURT:  But it's a phrase that seems to support

11   Ms. Cutri-Kohart's argument that Congress was focused on the

12   reviewability of the -- of this particular designation

13   determination as opposed to who got to make it.

14        MR. AMDUR:  Well, I think the word "unreviewable"

15   does that.  That -- that addresses reviewability, but here

16   Congress said sole and unreviewable discretion.  And so the --

17   the addition of the word "sole" has to mean something,

18   otherwise Congress could have just said unreviewable

19   discretion.

20        And here I don't -- we don't have to speculate about

21   what that means because the D.C. Circuit has just given us its

22   interpretation of that language, and it said that, quote, this

23   confines the judgment to the Secretary's hands.  So, I mean,

24   unless the word "sole" is written out of the statute --

25   because, again, unreviewable is already there.  Unless sole

1    just comes out of the statute, the statute is really making

2    sure that this function is performed by a particular official.

3    And I think that makes sense here because this is such a large

4    scale, important policymaking decision about, you know,

5    whether -- whether removal without a hearing is going to be

6    extended to the whole country, to people who have been living

7    here for years.  I mean, that's -- that's not the kind of

8    tectonic shift in immigration policy that you would -- you

9    would want some lower-level employee within DHS making on their

10   own.

11        THE COURT:  Although Ms. Cutri-Kohart says that

12   that's actually happened; right?  That the -- that there is at

13   least a regulation that suggests that there -- that the

14   Secretary can delegate within the agency this determination and

15   that the Blackwell declaration, I think she said, indicates

16   that this has already occurred.

17        MR. AMDUR:  Right.  So I would -- I would say two

18   things in response.  Number one, the statutory definition of

19   function or duty that we're looking at here in -- in section

20   (a)(2)(A), it only asks whether, quote, a statute assigns the

21   function to one particular office.  And so, you know,

22   subsequent agency actions don't have any bearing on whether a

23   statute has assigned the function to this office.

24        Number two, I don't -- I don't think either of those

25   agency documents could validly take away the Secretary's sole

1    discretion.  The statute says this is the Secretary's ultimate

2    responsibility, but I don't actually read the documents they're

3    citing to do that.  I mean, Delegation 100.2, which they cite,

4    is a completely general statement that the deputy can sign

5    rules and regulations.  It doesn't say anything about expedited

6    removal.  I don't read it to override, you know, what the

7    D.C. Circuit says, which is, again, this judgment is confined

8    to the Secretary's hands.

9         THE COURT:  In fairness, the D.C. Circuit wasn't

10   focused on delegation, though.  I mean, that wasn't the context

11   in which they were making those descriptions; right?

12        MR. AMDUR:  Agree.  Agree.  Only making the point

13   that the D.C. Circuit recognized that "sole" has independent

14   meaning.

15        And then the regulation, you know, I think is -- is a

16   tougher call because it does purport to give this decision to a

17   different official.  But, number one, you know, even DHS

18   doesn't think that that regulation governs here because for

19   this -- for this rule, the Secretary signed it -- or the

20   purported Acting Secretary, not that other official.  So

21   they -- they disregarded that regulation in this case.

22        And I -- I also don't read the regulation to say that,

23   you know, the Secretary's cut out of the decision altogether;

24   that this lower-level official could make the designation, you

25   know, even without the Secretary's approval.  Again, it -- that

1    wouldn't be consistent with the statute, and you wouldn't want

2    a decision like this being made without the Secretary.

3        If I could just pivot to one last thing, though, because

4    I don't think the government is correctly stating the standard

5    here.  You know, the government thinks that a duty can't be a

6    function or duty for Vacancies Act purposes, unless there's

7    these magic words in the statute that say, you know, it shall

8    be prohibited for this to be delegated.  Those -- those words

9    appear in very few statutes.  You know, we -- we couldn't find

10   almost any that apply to the Department of Homeland Security,

11   like three or four.  The government hasn't cited any.

12       And so what that means is if the government is right,

13   that almost nothing counts as a function or duty, which would

14   just be -- I mean, it would be an unbelievable narrowing of the

15   Vacancies Act to conclude that, you know, faced with all of

16   these concerns about encroachment on its power, Congress

17   enacted this comprehensive scheme that turns out to be almost

18   completely toothless because there's almost no functions across

19   the government that it applies to.  That can't be right, as

20   Judge Moss explained in the *Cuccinelli* case.

21       And I think the last thing I'd say is there's a very

22   specific point that makes clear that the government can't be

23   right, that these magic words are required, which is the

24   D.C. Circuit's case in *Doolin* from 1998, was -- was just about

25   the most specific thing that Congress was seeking to overturn

1    in the Vacancies Act.  If you look at the Senate report, you

2    know, *Doolin* is the primary motivation.  And in *Doolin*, the

3    Court approved a ratification, and -- and the function that was

4    ratified was concededly a delegatable function.  So the

5    function in *Doolin* would not have met the government's magic

6    words standard.

7         The -- the Senate report says that the ratification

8    approach in *Doolin* would render enforcement of the Vacancies

9    Act a, quote, nullity.  And so, you know, reversing that

10   ratification approach was -- was one of the core motivations.

11   But under the government's theory, the act would actually leave

12   *Doolin* intact on that point.  It would never have reversed that

13   ratification approach at all.  And so it would have failed to

14   accomplish the most specific thing that we know Congress set

15   out to achieve.

16        And so we submit that that -- that can't be right.  The

17   standard is that it's assigned to a particular office.  I know

18   others and based on this unique language, assigning it to the

19   Secretary's sole discretion here, we think that standard is

20   easily met.

21             THE COURT:  All right.  Thank you.

22        Ms. Cutri-Kohart, it looks like you want to say one more

23   thing.

24             MS. CUTRI-KOHART:  I do, Your Honor.  I would direct

25   the Court if -- to the extent you're going to rely on the

1    legislative history here, to consider the entire legislative

2    history of this bar.  Congress was also concerned with the

3    continuity of government operations during -- during a

4    vacancies act, and they specifically stated in page 18 of their

5    report that they viewed functions or duties as the

6    nondelegatable functions or duties of the officer.  That's at

7    page 18, 105-250.

8         And, yes, as even Judge Moss acknowledged this when he

9    relied on this broad delegation to the Deputy Secretary, that

10   there are a lot of things that are not functions or duties when

11   you define it as only nondelegatable functions or duties.

12        THE COURT:  Of course.  But the question -- the

13   million dollar question is which side of the line does this

14   particular act fall; right?

15        MS. CUTRI-KOHART:  Congress knows how to use the

16   phrase may not be delegated, may not be redelegated, shall not

17   be redelegated, and not subject to delegation in statutes, and

18   there are a small number, but still a number of statutes, that

19   do use those phrases, some that apply to the heads of all

20   departments, not just DHS.

21        Just kind of a random example, 35 U.S.C. 202(f)(1),

22   which has to do with assignment of patent rights, and says that

23   heads of agencies cannot delegate that function -- parts of

24   that function.  Sole discretion is not the same as

25   nondelegatable.  It -- and to -- to read that into it expands

1    the bar ratification beyond the bar that Congress intended.

2           THE COURT:  All right.  I think I understand this

3    argument.  Why don't we take a break.  I don't want to keep us

4    too long.  Let's take five minutes.  It's now 11:30.  We'll

5    come back at 11:35 and we'll shift to part two of our

6    arguments.

7           All right.  Thank you.

8           (Recess taken.)

9           THE COURT:  So we'll go back on the record.

10           Mr. Reuveni, before we -- before when we were having a

11    discussion, you suggested that there are different arguments

12    with respect to jurisdiction and the remaining claims than --

13    at least with respect to the Appointments Clause issue and, I

14    guess, perhaps the 1182 issue.  Do you want -- maybe we should

15    start there in terms of whatever jurisdictional arguments the

16    government has concerning the other claims that are being made

17    by the plaintiff, and then I'll let Mr. Balakrishnan respond

18    and get into the merits of those claims.

19           MR. REUVENI:  Certainly, Your Honor.  And just --

20    just one clarification.  I'll -- you want me to address the

21    merits now as well, or it's their motion, maybe they -- I guess

22    I'll respond after Mr. Balakrishnan.

23           THE COURT:  If you could just put on the table the

24    jurisdictional issues that you have with the remaining claims,

25    and I'll let Mr. Balakrishnan respond to jurisdiction and get

1    into the merits.

2              MR. REUVENI:  Very good.  Thank you.

3         I think we have a number of just threshold issues to

4    address, not just jurisdiction under 1252(e)(3) but also what

5    does *Make the Road* mean for the remaining APA claims that

6    plaintiffs have here.  And just before getting into that, I do

7    want to just ask the question of plaintiffs' counsel, if you

8    decide the FVRA issue, do you need to decide any of this other

9    stuff if you find jurisdiction to get there?  And I think we'd

10   agree you don't.  If you decide the FVRA issue, we don't need

11   to decide this other stuff, but you would still have to -- and

12   you're going to laugh again, because you didn't like what I had

13   to say about this the last time.  But with the one caveat that

14   we'd have to talk about remedy, because we think maybe the

15   remedy issues would be different if it's just the FVRA as well

16   as some of the other claims; but I'm happy to get into that

17   later.

18             THE COURT:  Can you just put on the table -- I've

19   now -- I've now written twice, both in *Make the Road* and in the

20   recent case called *Kiakombua*, about the government's sort of

21   generic or general arguments related to remedy, but what --

22   what is the remedy issue that is specific to the FVRA?

23             MR. REUVENI:  Certainly, Your Honor.

24        I think a couple points on that.  In -- in *Make the Road*

25   September version of last year, you ruled on the APA and you

1   found threshold deficiencies, notice and comment, and arbitrary

2   and capriciousness, and you set it aside on that ground as an

3   injunction.  But the Court of Appeals took those options away,

4   I think, when it took away the APA cause of action here.

5       And the FVRA, I think we pointed this out in our brief

6   at page 32.  If you find that it's not a function or a duty,

7   then there's no independent remedy under the FVRA.

8       And then just looking at the four cases that I'm

9   familiar with that have dealt with these issues.  So two of the

10  cases, Judge Moss's recent decision you were discussing with my

11  co-counsel and another case out of the Northern District of

12  California, those both were essentially preenforcement

13  challenges.  They relied on 5 U.S.C. 705.  So they stayed the

14  effective date of the policy that one can actually get off the

15  ground.

16      The one case I would definitely point the Court to is

17  the *CASA de Maryland* case out of the District of Maryland

18  which, for remedy purposes, I think -- is at least at this

19  argument and all fours, there the plaintiffs raise

20  organizational standing -- I'm sorry, raise associational

21  standing as their own theory of injury.  And the Court there

22  said because plaintiffs have raised associational standing as

23  their own theory of injury, it is appropriate at the

24  preliminary injunction phase, even in an FVRA case, which is

25  what that case was, to limit the relief to plaintiffs and their

1    actual members, i.e., the association themselves.  I would --

2    so that, I think, is the only other case directly on point for

3    this issue.

4        And, of course, I can get to this later because it's

5    into some of the other merits issues.  I think we have to talk

6    about 1252(f) and how that may interact with the FVRA claim,

7    if -- if we get there.

8        One other point on that, the only other case I'm aware

9    of that got this far on these FVRA-type issues was *L.M.-M.*, the

10   *Cuccinelli* case, and that went to final judgment.  So I don't

11   think that's a good example of what one does in a remedy

12   situation.

13       I'd say the same at a preliminary injunction stage.  I'd

14   say the same about *Kiakombua*, which I read over the weekend.

15   That was a final judgment, and there you vacated the rule and

16   didn't issue an injunction, as Your Honor knows, and didn't

17   really address 1252(f) as it might apply in the unique context

18   of this sole and unreviewable discretion-type language.  There

19   that was an agency action that you set aside, which, as you

20   recognized, the court has said in *Grace* and other cases, have

21   said that's not covered by 1252(f).

22           (Indiscernible simultaneous cross-talk.)

23           THE COURT:  Let me -- let me summarize what I think I

24   hear you arguing; that the preliminary injunction stage is to

25   be distinguished from permanent injunction with respect to the

1    scope of the remedy such that even in a case in which the

2    permanent injunction would allow me or the -- the -- you know,

3    ultimate summary judgment-type ruling would allow me to vacate

4    the rule, the Court is limited in its ability to do so as a

5    preliminary matter in cases in which the plaintiff is an

6    association, claims associational standing, or whatever.  Is

7    that the argument that you're making?

8         MR. REUVENI:  That's our Article III argument,

9    Your Honor, yes, and that -- since plaintiffs only rely on

10   associational standing -- so injury to their members -- then

11   giving them full relief at the preliminary injunction stage on

12   whatever their theory may be, if it's the FVRA or any of these

13   other claims that we'll talk about, that gives them full

14   relief.

15        THE COURT:  How do you grapple -- how do you grapple

16   with the situation in which the members are themselves

17   anonymous because they do not have permission to be in the

18   United States and the government is looking for them in -- in

19   the way in which I would assume is happening in this kind of

20   scenario?  So is the government's position that in order to

21   provide preliminary relief the agency -- excuse me -- the

22   organization has to turn over its membership list?

23        MR. REUVENI:  With -- with the Court's indulgence, my

24   garage is opening so there's some noise for just a minute.

25        THE COURT:  That's all right.  Did you hear me?

1          MR. REUVENI:  Yes, I heard your question, and I'll

2     answer it.  Just one second.  I want you to be able to hear me.

3          Okay.  So plaintiffs in -- and defendants have had some

4     discussions on this before.  I'll get to the actual answer in a

5     minute, but we've always maintained in this case that it's

6     simple enough to craft a remedy where plaintiffs under seal,

7     under -- backed by sanction of contempt if -- if the government

8     does something that's beyond the scope of the remedy, provides

9     the names of their members and then ICE knows and the federal

10    government knows this list of people are not to be touched for

11    the duration of the lawsuit if there's a preliminary

12    injunction.  I think that's what normally happens in a

13    preliminary injunction context.

14         I take plaintiffs' point that, well, we don't want to

15    have to name our clients or our members, but that's not a

16    reason for a nationwide injunction simply because they want to

17    within -- under a motion to seal or some other sort of

18    protective measures the Court can order -- again, backed by

19    contempt of sanction if ICE does something untoward -- that

20    that's not a reason why I should get an injunction.

21         I mean, we -- last I understood -- and I'll let

22    Mr. Balakrishnan speak to this more.  The numbers may have

23    changed, but I think we're in the low tens of thousands of

24    individuals we may be talking about.

25         And this sort of relief has occurred in other cases, not

1     just -- I'll look at, again, the FVRA case in Maryland.  The

2     members there were not insubstantial, and that included

3     individual aliens.  I'll point out a recent case that we cited

4     in our brief in the Northern District of California in front of

5     Judge White, one of these COVID presidential proclamations.

6     You had, like, the chamber of commerce and a number of other

7     very large organizations with many, many members seeking court

8     visas and work authorizations.  And the injunction there is

9     limited to the members of those organizations.  So it's not

10    that these types of injunctions limited to membership are not

11    manageable.  They are.  We've seen that in other cases.

12         So I don't think that plaintiffs want to not have to

13    convey who these individuals are so they can take advantage of

14    the injunction is a reason to grant a nationwide injunction.

15    It's a reason to not grant relief at all if they're not willing

16    to meet us halfway in some sort of equitable, fair, manageable

17    preliminary injunction if that's where the Court goes with it.

18         THE COURT:  So I guess your answer is yes, they'd

19    have to turn over the list of people.

20         MR. REUVENI:  I mean, there's no other way that the

21    federal government would know if they're complying with the

22    Court's order.  Yes, I would think they would have to -- and,

23    again, we've -- we've offered to work with plaintiffs on this

24    repeatedly to try and find a way that works for both sides.

25    And I'm getting ahead of myself because I'm assuming we're

1    going to lose and enjoin, but if we get to that stage, then you

2    can order the parties, go spend a few days, figure it out.  If

3    you can't figure it out, I'll tell you what to do.

4         And I think we have some precedent and some examples

5    that the federal government is familiar with in these other

6    cases involving, again, tens of thousands of individuals like

7    the case out of the Northern District of California or the case

8    out of Maryland.  I'm -- I'm sure there are other examples.  If

9    the Court would like, I can bring them to the Court's attention

10   later, but this is not new.  This has been done before and so

11   there's a way to --

12              (Indiscernible simultaneous cross-talk.)

13              THE COURT:  I'm just trying to understand whether the

14   law requires it.  I sort of view this in a mirror opposite of

15   the way that you are setting it up; right?  Because your --

16   your analysis suggests that it is untoward for the Court to

17   prevent the government from engaging in the challenged practice

18   categorically when we know at least under the APA that's the

19   standard course of affairs when the government has an action

20   that plaintiffs have successfully proven is unlawful.  That

21   action is set aside.

22        Now, whether or not we categorize that as a nationwide

23   injunction -- I mean, that's language that the defense and the

24   government seems to be bringing to this of late, but that's the

25   ordinary course of affairs.  It's not like that's unusual.  It

1    seems to me what is unusual is the suggestion that even if a

2    preliminary context when the plaintiff has successfully proven

3    that they're likely to succeed on their claim, that the

4    government's action is unlawful and cannot be sustained in any

5    event.  I mean, we're talking about a facial-type challenge to

6    government action.  Even in that circumstance, the plaintiff

7    has to -- is only entitled to -- or the Court only has the

8    power to enjoin in sort of an as-applied fashion.

9         And I don't know where that comes from, other than the

10   government's insistence upon labeling it as a nationwide

11   injunction and suggesting that there's something wrong with

12   it.

13        MR. REUVENI:  Well, I -- I have a couple of responses

14   to that, and I don't want to talk about from our perspective a

15   nationwide injunction.  We've had that conversation.  Your

16   position on that is clear.  I'm not saying anything here about

17   the nationwide injunction per se.

18        What I'm saying are a couple different things that are

19   maybe of the same category of argument but not quite that same

20   species of argument.  I think, first, you asked where did that

21   come from.  Well, we know from a number of cases -- we've cited

22   these in our briefs, both in the D.C. Circuit and, of course,

23   the Supreme Court -- the injunction -- the preliminary

24   injunction, what it's for is to provide whole relief to the

25   plaintiffs, not whole relief to the whole country, not whole

1    relief to the whole world, but to the plaintiffs and --

2             (Indiscernible simultaneous cross-talk.)

3             THE COURT:  But can I stop you, Mr. Reuveni, because

4    this -- it's going to be hard in this context, as I said, to

5    have a back and forth, but I just want to inject that its whole

6    relief to the plaintiff of the same type as the plaintiff would

7    receive at the end of the day because -- but you're just doing

8    it preliminarily due to the plaintiffs' injury.

9             That's what a preliminary injunction is.  You're not

10   giving them a different kind of relief than what they would be

11   entitled to.  So that's precisely why you're evaluating the

12   likelihood of success on the merits of the claims that they

13   make and you see what it is that they're asking for at the end

14   of the day and you're giving it to them now.

15            MR. REUVENI:  So, respectfully, Your Honor, we would

16   just disagree with that.  I know -- I just -- one quick point

17   on that and I'll move on to a couple other things on this.

18            There's no such thing as a set-aside vacatur of the --

19   of a rule at the preliminary injunction phase.  That's what you

20   do on final judgment.  At the preliminary injunction phase,

21   you're issuing an injunction, balancing the equities to try to

22   keep the status quo in place, to protect the interests of the

23   parties, and the government has interest here to.  The

24   government has interest in exercising its sole and unreviewable

25   discretion here.

 1          And plaintiffs can get a remedy now, which is not a

 2     set-aside remedy.  You wouldn't vacate the rule at preliminary

 3     injunction.  I've never heard of that.  That's not a thing.

 4     That's preliminary declaratory relief or preliminary equitable

 5     relief other than an injunction.  That's not something you get

 6     on a preliminary injunction.  The D.C. Circuit has said this in

 7     the *Nebraska Department of Health* case, which we cited in our

 8     last set of papers.  That's 435 F.3d 326.  The Court should not

 9     have enjoined the agency from applying the regulation to any

10     party when an injunction covering the plaintiffs alone

11     adequately protects the plaintiffs.  I mean, that's what a

12     preliminary injunction is for.  It's a balancing of the

13     equities on all sides, trying to maintain somewhat of a status

14     quo.

15          If we went straight to summary judgment which, as

16     Your Honor knows, the government proposed doing on a somewhat

17     similar schedule, we wouldn't be having this conversation, I

18     think, because you could set aside the policy and we'd be done

19     and we couldn't apply it to anybody.

20          But on that, I think Judge Moss's decision in *Reptile*

21     *Keepers* -- again, which we cited last time at 106 F. Supp. 3d

22     at 128 -- it says there's a distinction between a final

23     judgment, which midway *National Mining Land*, the D.C. Circuit's

24     decision that you relied on and plaintiffs relied on -- or

25     continue to rely on and the preliminary injunction phase,

1   which, again, you don't -- you're not setting aside the rule at

2   the preliminary injunction phase.  You're trying to maintain

3   the status quo as to the parties.  And I think Judge Moss goes

4   into that in some detail and explains, in the government's view

5   persuasively, that at the preliminary junction phase, the need

6   for tailoring is much more important than in final judgment.

7              THE COURT:  All right.

8              MR. REUVENI:  So I'll move on from that.

9              THE COURT:  All right.

10             MR. REUVENI:  I'm happy to come back to 1252(f)

11  later, because I think that affects all the arguments, unless

12  you want to hear about it now.

13             THE COURT:  No, that's fine.  Keep going.

14             MR. REUVENI:  Oh, I'm sorry.  On -- on remedy or on

15  jurisdiction?

16             THE COURT:  Sorry.  You can come back to it later, if

17  you would like.

18             MR. REUVENI:  Okay.  I'll do that.  Thank you, Your

19  Honor.

20        So just to jurisdiction.  Sorry for the detour with

21  remedy, but I had to just get our points out.  So on

22  jurisdiction, I think, first, we need to start with just what

23  did D.C. Circuit do in *Make the Road*.  Plaintiffs would have

24  the Court view it as we had two very narrow claims on appeal,

25  Claim 3 and Claim 5 -- I'm sorry, which one was -- the notice

1    and comment claim and the arbitrary and capricious claim.  I

2    think that was actually Claim 1 and Claim 5.

3         And they would have you believe -- or view that

4    D.C. Circuit's decision as just relating to those cases, but I

5    think the D.C. Circuit's decision is fairly broad.  We -- we

6    cite the relevant language in our brief, but it says

7    essentially under no APA cause of action unless they can show

8    that the government had exceeded statutory or constitutional

9    bounds.  Now, you'll note, we didn't make -- we're not -- the

10   argument I'm about to make now we didn't make for the FVRA

11   claim because that's a set -- did -- did the Secretary exceed

12   the statutory authority?  That's the classic sort of you don't

13   have discretion to exceed your statutory authority.  That's

14   your *ultra vires* statutory authority-type issue.

15        But putting that claim to the side, all the other claims

16   that are left are either classic APA claims challenging how the

17   Secretary decided to exercise discretion.  Meaning, for

18   example, to take their Claim 3, they say the Secretary should

19   have considered the effect of this new designation on the new

20   class of individuals and had findings or issued new rules or

21   new procedures more indifferent and in the plaintiffs' view

22   better than the last set of procedures that have been in place

23   since 1997.  And the D.C. Circuit, I think, pretty clearly

24   rejects that.  It says you can't superintend, to use the

25   Court's language, the decision of the Secretary to expand or

1    exercise designation authority.

2            THE COURT:  All right.  So that argument is not --

3    it's not a time bar kind of jurisdictional thing.  You're just

4    saying *Make the Road* forecloses their attempts to raise certain

5    other APA-related challenges now?

6            MR. REUVENI:  Well, I think the two are combined --

7    are related for this reason.  Because of what *Make the Road* has

8    done, I think they've pivoted a bit in how they've framed their

9    claims this time compared to last time.  Much more this time,

10   they're saying they're challenging the regulations themselves

11   as applied to them, compared to last time.  And I think they

12   have to do that because of *Make the Road*.  So that's the part

13   that's time barred in our view.

14           And I can get to that in a second.  I just want to get

15   through the other -- with the Court's indulgence, other three

16   claims that, I think, are governed by this sort of new

17   post-*Make the Road* legal groundwork.

18           Claim 3 and Claim 5 are arbitrary and capricious;

19   Secretary should have done things he didn't do.  I think those

20   are clearly foreclosed by *Make the Road*.

21           Claims 4 and 8, putting a pin in 8 on whether it's

22   properly added to the complaint at this point, I'll talk to

23   that -- about that in a second, but probably more broadly.

24   Claim 4 is, well, the statute requires access to counsel

25   because of these other provisions, 1362 and the APA.  And

1     you're going to have to look at the merits of it there.  Is

2     that correct or not?  But once you do that and decide the

3     statute doesn't require that, that's the end of the claim on

4     *Make the Road* because the government hasn't exceeded their

5     statutory authority.

6          And let me explain why we think Claim 4 fails on the

7     merits, because there's no requirement for counsel, there's

8     just a consult right under 1225(b)(1)(B)(v).  And the same is

9     true about Claim 8.  They announced that for the first time in

10    the 23 years of this being in effect, that you can't apply

11    expedited removal to individuals who have crossed the border

12    when once they've crossed the border, at least under

13    1182(a)(7), the admissibility bar that goes to whether you

14    have, basically, documents that say you're entitled to enter

15    the country.

16         Two points on that.  I mean, one, that's a statutory

17    authority question.  So if you find the government's -- adopt

18    the government's view that they're wrong on that, that's the

19    end.  There's no more APA claim there under *Make the Road*.

20         But then also just the time bar issues.  Starting with

21    (a), as we point in our brief, the government's been applying

22    1182(a)(7) to people in the interior since 2002.  And in 1997,

23    the government in the initial rulemaking that set out the

24    expedited removal procedures that are still in effect today,

25    commented on we're not expanding it to the interior now.  We

1     want to see how this goes at the ports of entry first, but

2     we're putting together procedures that will apply on the

3     interior if we do this.

4         And that -- that claim is not something plaintiffs can

5     argue even if they do at the FVRA claim that is -- is new to

6     them.  All that's happened is a decision came out in the

7     Ninth Circuit a couple -- couple months ago saying something

8     that is now helpful to their position, but they've known about

9     this for years.  I mean, we've been litigating -- the

10    government and plaintiffs' counsel -- about expedited removal

11    for years.  I mean, it is very hard to argue that they didn't

12    know that this was being applied to people on the interior,

13    since it's being -- been applied to people on the interior

14    since 2002 when the initial designation extending expedited

15    removal nationwide for people arriving by sea was put into

16    effect.

17        So even if it's not jurisdictional, the 60-day bar

18    there, there's no argument for tolling.  There's no argument

19    for relate back.  They didn't make these arguments -- anything

20    that puts us on notice -- that they were making this argument

21    in the last complaint.

22            THE COURT:  So those are two different things, I

23    think.  I'm trying to -- you -- you have a tendency to talk

24    fast.  So I'm trying to take in what you're saying.

25        On the one hand, you have the same argument that you

1   made with respect to the appointment issue or appointments

2   claim, which is they added this in the recent round of

3   amendments, it wasn't in the action that was brought in 60

4   days.  That's one species, I think, of this argument, which is

5   the second thing you said.

6        But I thought the first part of what you were talking

7   about with respect to the 1182 argument was of the nature of

8   even if they had said this 1182 thing in their initial

9   complaint when they filed it, it was untimely at that point

10  because the relevant operable act of the Secretary occurred

11  when this was enacted originally and so they should have been

12  making that claim earlier.  Am I right about that?

13            MR. REUVENI:  Yes, Your Honor.  I -- I apologize.  I

14  think I buried the lead there a little bit in the way I

15  presented this, because this is our strongest and best argument

16  for Claims 3, 4, 5, and 8; that every single one of them now,

17  now that we're back here after what the D.C. Circuit says in

18  *Make the Road*, plaintiffs say, well, it's not so much that

19  we're challenging the Secretary's exercise of discretion.  We

20  lost that.  So we concede that.  What we're challenging now is

21  all these procedures that have been in place and all these

22  rules that have been in place for years and have been being

23  applied to individuals on the -- in the interior for years,

24  because that -- that's different.  That's not sole and

25  unreviewable discretion, or that's not covered by the APA.  I

1    mean, those claims, we think, are time barred.

2         I mean, these rules have all been in effect for the

3    procedures that the -- the regulations put in effect, 235.3,

4    on -- on how you -- what happens if you say I've been here more

5    than two years or I'm a citizen or I'm a Green Card holder or I

6    should not be subject to it, and what rights you have and now

7    you present evidence and whether you can talk to anybody,

8    whether you have a right to counsel.  All these things have

9    been on the books since '97, and all these things have been

10   applied to folks on the interior since 2002 nationwide with

11   respect to at least the folks arriving by sea and have been --

12   being applied in the interior since at least 2004, within that

13   14-day hundred-mile range.

14        And plaintiffs say -- and, look, I understand the

15   argument -- well, this is the first time this is being applied

16   to this new group, but this comes back to whether this

17   1252(e)(3) is jurisdictional or not to some extent, and just

18   what -- what was Congress trying to do in the 60-day time bar;

19   I don't think that matters.  I think as -- as justice -- or

20   Judge Sullivan explained in his district court decision, it

21   runs from a fixed point.  And that fixed point, as the

22   D.C. Circuit said in *AILA*, is April 1st, 1997.

23        And nothing they're challenging now 23 years later is

24   different than what it was then; and I'd also point out, as I

25   mentioned earlier, that more plaintiffs, it's not to challenge

1   aspects of the procedures outside of ports of entry or -- or,

2   for example, the asylum procedures.  There were plaintiffs that

3   sought to challenge that.  And -- and the 1997 rulemaking that

4   was challenged put everything we're talking about today, put

5   everything in effect, and that, I think, is instructive.  It

6   was there.  It's not new.  It wasn't put into effect now, and

7   that -- that's it.  Congress wanted one bite at the apple on

8   that.

9           THE COURT:  I want to shift to Mr. Balakrishnan to

10  have him respond to that, and then get into its merits'

11  arguments, but I will say this is -- it's kind of tough; right?

12  Because the point that you make is well taken insofar as the

13  procedures that pertain to expedited removal.  This thing we

14  called expedited removal may have existed as of 1997 when the

15  IIRIRA or whatever was enacted, but to the extent that that

16  expedited removal basket of procedures was not applicable to

17  this new group of people, is it the case that the new group of

18  people lose their right to challenge once it becomes pertinent

19  to them?

20          They couldn't have challenged it before because

21  presumably they had no standing.  Now they have standing

22  because suddenly, you know, the agency says, okay, we're going

23  to apply this set of procedures to you now.  I -- I don't know

24  that Congress, in their statement with respect to time bar,

25  meant to preclude people who were affected by a new written

1    policy of the agency that applies a preexisting set of

2    procedures to them to preclude them from bringing a challenge

3    within 60 days of when that application occurred.  And

4    that's -- I think that's the government's position.  Too bad,

5    so sad.  If the agency suddenly decided to apply this to

6    whomever, you only had 60 days or a person -- not -- not you,

7    because presumably the government would have said no standing

8    if these people tried to bring this claim earlier.  But you

9    just lose your opportunity to raise that issue because it's

10   more than 60 days after when we first fashioned what these

11   procedures were going to be.

12          MR. REUVENI:  Yeah, I think -- it's a -- it's a harsh

13   position, admittedly.  It's a position that doesn't really --

14   it's -- it's -- it's -- it's a tough position.  I get that, but

15   the statute says what the statute says.  And -- and I'm

16   defending what the statute says.

17         And I think in response a couple things.  I mean, first,

18   to go back to *AILA*, that was the argument in *AILA*.  The

19   argument was you have to let us in to challenge this because if

20   not, no one is going to be able to challenge this later.  And

21   that's what Judge Sullivan did with prudential standing, and

22   that's what the Court actually addressed and reversed; that we

23   actually think -- the D.C. Circuit said in *AILA* -- that's

24   exactly what Congress meant; that we get one bite at the apple,

25   put all your arguments in one case, and make those arguments.

1          The second thing, this is the same sort of argument

2     we've seen in a lot of these other district court cases that

3     have been going on in D.D.C., that, well, I didn't get a chance

4     to challenge this when it was put into effect or I wasn't even

5     born yet.  How am I supposed to have challenged that?  And we

6     see that in a lot of as-applied habeas cases under 1252(e)(2),

7     individuals saying I wasn't alive then.  How can I be expected

8     to have alleged this was unconstitutional?  And every court to

9     address those issues, circuit courts, district courts, have

10    said that's what Congress intended.  Too bad, so sad, as you've

11    said.  That's not the government's position in so many words.

12         There could be extreme cases where there's a way around

13    that.  I don't think this is it.  And in *Dugdale,* another case

14    in the district court, Judge Cooper grappled with this exact

15    point.  *Dugdale* was a Canadian national with dual -- with

16    potentially even dual citizenship.  That was the issue in his

17    case, whether he had derived citizenship.  So he could have

18    been a citizen coming and going across the border for years,

19    placed in expedited removal, and says, well, you can't apply

20    this to me.  This is unconstitutional.  The 60-day rule is

21    unconstitutional.  The procedures are not enough.  I'm -- I'm

22    someone with substantial connections to this country.  I've

23    been coming here lawfully for years.  And I think

24    Judge Cooper -- I mean, he wasn't happy with the results, but

25    he -- he basically explained this is what Congress has said and

1    until I'm told otherwise by the Court of Appeals, I have to do

2    this.  And so I think *Dugdale* addresses that point.  *AILA*

3    addresses that point.

4         I'm happy to speak to this on the merits in response

5    to --

6         (Indiscernible simultaneous cross-talk.)

7         THE COURT:  Yes.  Let me have -- Mr. Balakrishnan,

8    maybe you can start where we've left off in terms of these

9    threshold considerations and then get into why, assuming you're

10   allowed to bring these challenges, you -- you should win on the

11   merits.

12        MR. BALAKRISHNAN:  Thank you, Your Honor.

13        Yeah, as to this sort of threshold question, I want to

14   take on what I understand to be sort of the two central claims

15   the government is making here.

16        The first is whether the Court of Appeals' decision in

17   *Make the Road* forecloses all of our claims, all of our

18   remaining claims.  The second being the time bar issue.  And I

19   think they both -- to understand sort of the answer to both, I

20   think it's important to sort of focus on the way the expedited

21   removal is structured and the role that a designation decision

22   plays within it.

23        You know, Congress set up a statute that said, you know,

24   in the first section of 1225(b)(1)(A)(i), it says if an

25   immigration officer determines that someone who is at a port of

1    entry or described in one of the paragraphs below is

2    inadmissible on one of these two grounds, they may order them

3    expedited -- they put them in expedited removal.

4         That -- you know, and then subsequently, there's a

5    specific section, which is the designation provision, which

6    provides that, you know, the Secretary in its sole and

7    unreviewable discretion may designate classes to whom that

8    first section may potentially apply.  That designation decision

9    is a categorical description of people to whom the expedited

10   removal system may be implemented.  And that is what the Court

11   of Appeals decision was entirely focused on.

12        But there's a second question here, which is -- you

13   know, and all of our claims assume this.  You know, you can

14   assume that the designation decision was properly issued, but

15   there still is a subsequent question which is what procedures

16   are implemented to allow an immigration officer to make the

17   necessary determinations that someone is properly placed into

18   the expedited removal system.

19        THE COURT:  Well, let me ask you a question before

20   you -- that was very helpful in terms of what it is that you're

21   trying to get at.  But where -- isn't this Court limited under

22   1252(e)(3) with respect to what it is that I have jurisdiction

23   to review?  So to the extent that you're trying to get at the

24   procedures that the agency has put into place with respect to

25   individual officers making determinations, is that a written

1    policy or procedure that I can review under the statute?

2            MR. BALAKRISHNAN:  Yes, Your Honor, it is.  I mean,

3    and it's contained in two different places.  You know, the --

4    the 2019 rule itself -- you know, we described it as the

5    designation, but it does more than that, you know.  It

6    designates the new class, and then a separate section says

7    implementation considerations and states that the preexisting

8    written regulations and rules will apply to this new class of

9    noncitizens, and then further states that the agency is going

10   to promulgate additional guidance, you know.

11          And then the October 2020 memo is that additional

12   guidance.  And that reiterates and reincorporates the previous

13   written regulations and policies and also further adds in --

14   you know, it makes a couple of modifications, the first of

15   which is to make -- to include a provision allowing a brief but

16   reasonable opportunity, which is defined later as -- you know,

17   in the training materials, as no more than 72 hours for a

18   detained individual to get access to the information they need

19   to demonstrate continuous residence.

20           THE COURT:  Let me just ask you this:  If that's the

21   case, if your theory is that the written policies that the

22   Court has jurisdiction under the statute to review are policies

23   that incorporate procedures that have existed since 1997 and

24   Mr. Reuveni says 2004 and whatever else, then why doesn't he

25   have a good point that by virtue of the statutory time bar

1    those policies needed to be reviewed, interrogated, and, you

2    know, litigated at the time that they were initially imposed?

3         Your theory, this incorporation theory, I will call it,

4    opens the door now for the prelitigation or reconsideration or

5    evaluation of policies that have been in place for 20 years.

6    And I don't know that that's what Congress intended when it

7    expressly limited the Court's ability or, you know, claims

8    processing or whatever when it expressly said you have 60 days

9    to challenge the policies of the Secretary.

10        MR. BALAKRISHNAN:  And -- so two responses.  The

11   first of which goes back to the -- the function of a

12   designation.  You know, prior -- until the Secretary designates

13   a new class, the statute and any policies that have been issued

14   under it have not yet been implemented to that new class.  They

15   are first implemented only when the designation takes place.

16   It's a legal impossibility for them to have been implemented

17   against the new class because there was no authority to do so.

18        And -- you know, and that's what makes this sort of a

19   unique and distinct position that we're in from some of the

20   cases that government's counsel has mentioned where someone

21   says, well, these policies were created years ago, I've only

22   been put in expedited removal two years later.  You know, here

23   it's not a question of the fact that, you know, they came to

24   the country later or, you know, they -- they were apprehended

25   later or there was prosecutorial discretion.  Here there was no

1    underlying authority for either the expedited removal statute

2    or any of the written policies to have been implemented against

3    this new class, period.

4         So it was only with the designation that the first

5    implementation of both the statute and any written policies

6    could be implemented.  So this is not throw the doors wide open

7    to sort of a flurry of claims in (e)(3), attempting to

8    relitigate, you know, issues every time there's a new written

9    policy issued.  This is a specific claim that will only arise

10   now when the Secretary has expanded expedited removal to its

11   fullest scope.

12        This is -- you know, this is the final designation in

13   some ways.  This is the only time this will happen, and this is

14   the only time that you will have the original statute and these

15   policies being first implemented to a new class.

16             THE COURT:  But it didn't have to happen that way.  I

17   mean, you know, theoretically, if the Secretary had

18   incrementally expanded the designation, you would be arguing

19   that either incremental -- it goes from 14 days to 30 days to,

20   you know, two months to whatever, each one of those in your

21   theory is a first implementation for the purpose of the 60-day

22   challenge; am I understanding you?

23             MR. BALAKRISHNAN:  Yeah, I think that's correct.  And

24   I think that's consistent with both -- I mean, yeah.  I

25   understand and know that Your Honor has been put in, it seems

1    like, a more unreasonable position than I think it is in

2    practical terms, but that's not the way designations have

3    actually been done.

4         But even more so, I do think it's consistent with sort

5    of -- with what Congress wanted.  I mean -- I mean, first of

6    all, there's a basic -- there's a basic issue, of course, of,

7    you know, the right to have one claims -- one's claims

8    reviewed.  The flip side of it, of course, is that Congress

9    wanted there to be judicial review over the implementation.

10   And it also created sort of a -- a designation system, you

11   know, which meant that the scope and implementation would

12   change over time.

13        And so I think reading those provisions together means

14   that that is exactly the result that Congress intended through

15   (e)(3).

16        And, you know, I just want to add one more point here,

17   which is that, you know, it's also -- these are individual --

18   like our -- the individuals who are part of the new class are

19   people who have been here for extended periods of time.  They,

20   therefore, have -- it's clear they have strong due process

21   rights.  It also raises -- you know, which people, you know, in

22   1997 did not.  And under the Supreme Court case law and

23   decision, people who are apprehended immediately after entering

24   the border may have decreased due process rights.

25        Moreover, there's also additional, you know, just purely

 1    functional and practical questions that come from this new

 2    designation to a larger group of people who stay here, that

 3    goes to questions as to how you assess continuous presence,

 4    that go to questions as to, you know, how you ensure that

 5    people who have been here for longer periods of time who,

 6    therefore, are more likely to have gotten some sort of form of

 7    legal status have an opportunity to present this.

 8         THE COURT:  Let me ask you a question, Mr. -- we're

 9    sort of pivoting into the merits that I find helpful given our

10    time.  I don't know if the fact that there are so many

11    questions about this category of new people to whom this

12    applies helps you or hurts you.

13         Because I -- I take what Congress is trying to do here

14    as allowing the Court to essentially entertain facial

15    challenges to written policies of the agency that violate, you

16    know -- what does it say?  Inconsistent with, you know, this

17    subchapter or otherwise in violation of the law, including the

18    Constitution.  What I can't seem to wrap my mind around is how

19    I'm supposed to know or be able to evaluate the due process

20    implications as a facial matter.

21         There may be people in this group of newly designated

22    folks who have the necessary substantial ties to the country,

23    but there may also not be people.  And you're talking about a

24    period of time from staying in the United States between

25    14 days and 2 years.  So I can imagine all kinds of scenarios

1    in which applying expedited removal to certain people within

2    this group would not work in a due process violation, in which

3    case I don't understand how I'm supposed to do this in a facial

4    way, which is what it appears I'm authorized to do under this

5    statute.

6             MR. BALAKRISHNAN:  Your Honor, I think -- you know,

7    your question goes more specifically to our claim that, you

8    know, the procedures implementing the statute don't provide,

9    you know, a fair process that the statute should be interpreted

10   to provide itself; right?  And -- yes.  And so there, you know,

11   I think -- this is -- you know, the Supreme Court -- you know,

12   there has traditionally been sort of the adoption -- in order

13   to solve this specific question that Your Honor faces, you

14   know, the adoption of a very bright-line test between those,

15   you know, who have effected an entry into the country and those

16   who have not -- with those that have effectuated physical entry

17   into the country as having increased due process rights.

18             And that is a line that Your Honor could draw, which is

19   that it is -- you know, it is clear that those who -- people

20   who have been here for more than 14 days have effected physical

21   entry and, therefore, have greater due process rights that

22   triggers more protective procedures.  And that will be fully

23   consistent with the case law.  You know --

24             THE COURT:  But would it be fully consistent with the

25   statute and the intent of Congress in the sense that they seem

1    to have drawn a bright-line and their bright-line was at 24

2    months, which is what the agency in this case does?

3            MR. BALAKRISHNAN:  But I don't think that's the

4    bright -- I mean, what Congress -- Congress authorized the use

5    of expedited removal up to that period of time, but they didn't

6    specify what procedures would accompany this statute.  I mean,

7    the statute is silent.

8            If, you know -- if the statute were -- the plain text of

9    the statute were to govern, you could deny everybody a

10   translator, you could deny everybody, you know, the ability to

11   even present evidence to an immigration officer.  So, you know,

12   Congress meant the courts to interpret the statute, you know,

13   to provide the requisite procedures to make sure it was

14   implemented fairly.

15           So, you know, the Court can interpret the statute to say

16   that for people who are part of this newly designated class who

17   have been here for -- you know, between 14 days and 2 years,

18   the -- their constitutional -- their clearly established

19   constitutional rights require greater procedures than the

20   government has thus far adopted -- best.  Yeah, has -- has

21   provided thus far.  So that, I think, is the solution to the

22   question Your Honor has presented.

23           THE COURT:  And -- and the Court can do that, you

24   think, on the basis of this record and without evaluating

25   whether there are people within that group who may not have

1    substantial ties to the country?  I mean, the Supreme Court

2    case law indicates that that's really the turning point and not

3    any particular number of weeks or months in the United States.

4         MR. BALAKRISHNAN:  Your Honor, but -- but there's

5    never been a holding that says that somebody who has been here

6    for more than 14 days lacks the substantial ties.  I think it's

7    fully consistent with the case law if you draw that bright-line

8    rule and say that.

9         And, furthermore, I think it's -- it's also appropriate

10   because, you know, the statute provides this one bite at the

11   apple and, you know, clearly authorizes and invites sort of

12   facial challenges to the statute based upon, you know, the new

13   class that's being designated.  And, you know -- and I think

14   there's two reasons why the Court should sort of adopt what

15   we're offering here.  I think the first is that the -- you

16   know, the *Mathews* test itself sort of looks at the mine run of

17   cases to develop what the bottom line procedure should be

18   across a class.

19        And I think that suggests that, you know, you look to

20   see -- you develop sort of one set of procedures based upon

21   what the due process rights of those who have been here in the

22   country and been physically present for more than 14 days and

23   apply it across the class.

24        I think the second is is that, you know, under cases

25   like *Clark v. Martinez*, for example, you know, this -- it's

1   permissible to interpret a statute in the form -- in -- in a

2   way that sort of applies, you know, if you think that there are

3   certain people who have been here for longer than 14 days who,

4   nonetheless -- nonetheless, lack the substantial connections to

5   create a heightened due process interest, then you should still

6   interpret the statute to be consistent across all of the cases

7   in the category so as to protect the constitutional rights of

8   those who clearly have them.

9           THE COURT:  I just don't know how I do that.  I'm --

10  I'm struggling, Mr. Balakrishnan, because ordinarily those

11  claims would come to me as applied.  And so the people who

12  actually have the constitutional rights would step up and say

13  here are my circumstances, this is a due process violation.

14  You know, Mr. Reuveni points to a Judge Cooper case in which a

15  person said exactly that, and that seems to me to be the way in

16  which one evaluates the constitutional contention when it turns

17  on something that itself is not bright-line, when it turns on

18  whether the person has substantial ties.

19          I mean, presumably the -- that test could have been

20  something else that would have been categorical in nature and

21  allow for the kinds of arguments that you made, but I -- I just

22  have a hard time seeing how I can presume that anyone who's

23  been in this country 15 days as opposed to 14 days has

24  substantial ties for the purpose of constitutional due process

25  without knowing anything about the circumstances of that

1    individual person.

2              MR. BALAKRISHNAN:  Your Honor, I think that here, you

3    know, our fundamental contention is is that everyone who is

4    physically present in the United States has due process rights.

5    And the only exception to that rule, you know, that the

6    Supreme Court has recognized was in the recent decision in

7    *Thuraissigiam*.  And there what they relied on was the fact that

8    the individual there was apprehended within 25 yards of entry

9    and explained that he had not made -- he had effectively not

10   entered the United States and so he was in the same position as

11   someone at the border.

12         So I think it's very consistent with, you know, the way

13   the Supreme Court has treated the due process rights of

14   noncitizens to simply say that those who have been in the

15   United States for more than 14 days all clearly have due

16   process rights that require sufficient protections under the

17   statute.

18              THE COURT:  And getting back to our point, and then

19   we'll move on to something else.  The initial point that

20   Mr. Reuveni has made is that an argument of that nature could

21   certainly have been brought within 60 days of the statute that

22   made clear that Congress intended for the Secretary to have the

23   ability to apply this expedited removal process to people up to

24   24 months.  Now, you're suggesting, yes, but they also didn't

25   go into what the nature of the actual procedure is and so maybe

1    Congress intended for more process.

2           But surely Congress in enacting IIRIRA was trying to cut

3    back on the process that had previously been given to

4    individuals who come into the United States.  I mean, that was

5    their entire point was to set up an expedited removal system

6    that did not require giving people lawyers, you know, having to

7    have a hearing, because that was -- that was the status quo

8    before the statute.  So they were creating a bifurcated system

9    in which there was something called expedited removal with

10   process that was less than the full hearing and counsel and all

11   of that, and they said the Secretary can exercise his or her

12   discretion to apply that expedited process to people up to 24

13   months.

14          And so it's just odd, in my view, to argue that not only

15   can we make as a categorical statement that the -- that the

16   process at issue here, the expedited removal procedures,

17   violates the Constitution for everybody who's been here beyond

18   15 days but that we also didn't have to make that argument

19   within 60 days of the enactment of the statute given this

20   provision that says that there's a time bar on making those

21   kinds of arguments.  I don't know how you can -- it feels like

22   you're trying to have it both ways, and I don't know that you

23   can.

24          MR. BALAKRISHNAN:  I think that -- you know, I think

25   there were sort of -- maybe -- I'm going to break down sort of

1   what you just said to me into two different parts and try to

2   address them separately.  You know, I think that, you know,

3   first, as Your Honor has already pointed out, I mean, when they

4   first enacted the statute it was applied only at ports of

5   entry.  So there was -- I mean, if the expectation of Congress

6   was that, you know -- let me just back up.

7          It was first enacted at ports of entry.  The

8   implementing regulations that have remained the staple since

9   then were specially designed for people at ports of entry.  You

10  know, there was nobody who had standing to challenge those

11  procedures.  There was no one who was in the interior of the

12  country who has standing to challenge the procedures at that

13  time.  So that would have created -- I mean, that hypothetical

14  basically assumes that Congress created a form of judicial

15  review that no one could ever access.  I think that's the first

16  point.

17         I think the second is that I think that the problem is

18  solved essentially by saying when there is a new designation,

19  the statute and the procedures are first being implemented,

20  because that allows for judicial review over the manner in

21  which they're implementing the statute as against this --

22              (Indiscernible simultaneous cross-talk.)

23              THE COURT:  Mr. Balakrishnan, only in insofar as the

24  designation has changed.  That was the beauty, in my view, of

25  *Make the Road* 1; right?  Because in *Make the Road* 1, you were

1    clearly challenging, at least as I interpreted it with respect

2    to your APA claim, the categorical decision by the Secretary to

3    apply this to a new group of people.  Period.  Whatever this

4    was, whatever the procedures were, that wasn't the challenge.

5    The challenge was did the Secretary do what he was supposed to

6    do under the APA when deciding to add these new people.  It was

7    very clean.

8          This is not -- because you're not now challenging the

9    actual decision-making process of the Secretary to expand the

10   designation to these people.  You're using that as a vehicle by

11   which to challenge the underlying procedures that are applied

12   in the context of expedited removal not only to these people

13   but to the people at the border and whoever else it applied to

14   before.

15         And so Mr. Reuveni says very legitimately that's too

16   late.  Those procedures are what they are.  The window has

17   closed to challenge those.  And even though Mr. Balakrishnan is

18   trying to suggest that it's a first implementation because we

19   have applied them to this new group, it's really not a first

20   implementation insofar as you're saying that those procedures

21   are deficient because they've been there all along.

22         MR. BALAKRISHNAN:  But, Your Honor, we are saying

23   that the procedures are deficient, because those procedures

24   were not designed with this new class of people in mind.  Those

25   underlying procedures provided no consideration of the fact

1    that people had to demonstrate continuous presence at all, let

2    alone up to two years.  That's why they had to have this new

3    implementation memo creating that new procedure.

4         There -- you know, these -- these are not -- these

5    procedures were not created for this new class of people, and,

6    instead, they're just being wholesaled moved on to them.  So

7    there are individual problems that need to be addressed now in

8    designing procedures for the new class.

9         You know, it's not -- the claim here is not that these

10    are -- you know, that the procedures are faulty for people who

11    are presenting at ports of entry.  It's not the question that

12    they're faulty as -- you know, as applied to people who have

13    immediately entered the country.  I mean, certainly there's a

14    long history of errors, you know, as to their using those, but

15    there's specific new questions that arise from the

16    implementation of the statute to this new group of people that

17    those procedures do not address and that the new -- and that

18    the -- that the old procedures do not address and that the new

19    policy memo further fails to address properly.

20         THE COURT:  All right.  So give me those questions.

21    Give me an example.  What are the questions that are isolated

22    to this group in this way?

23         MR. BALAKRISHNAN:  So, for example, there's the

24    question of continuous presence.  How do you -- you know, the

25    statute requires that, you know, to be placed into expedited

1    removal, an immigration officer is going to have to determine

2    that these -- these individuals are members of -- you know, are

3    within the proper scope of it.  So there has to be a finding

4    that they been here for, you know, less than two years.

5         There's -- you know, if you think about the expedited

6    removal process as applied to an individual, there's two

7    problems with what the government has done here.  First, you

8    know, they've created -- they've said that people should get a

9    brief but reasonable time to gather evidence of continuous

10   presence and present it to the immigration officer.  But the

11   training materials themselves limit that to a 72 -- in general

12   no more than 72 hours.  That is -- that is simply insufficient

13   for somebody who is detained, which, of course, people in

14   expedited removal are detained, because it means you have a

15   72-hour window to contact a third party, to get them to find

16   the documents, and have them send those documents to you in

17   prison so as to then present to an immigration officer.

18        The procedures take -- you know, do not take into

19   consideration what are naturally foreseeable problems with that

20   setup, which will lead most people to be unable to gather the

21   documents in time, nor does it contemplate any sort of formal

22   mechanism by which someone can request additional time to do

23   so.  That's only at the initial presentation stage, but, you

24   know, there's an additional problem, which is how the

25   continuous presence determination is even made.

1        So assume the following example.  Somebody says -- you

2    know, presents like a couple of phone bills, for example.

3    That's what they're able to get ahold of in this brief time

4    they're given.  You know, one from a year and a half ago and

5    the other from three months ago, and the immigration officer

6    says, well, this is -- you know, decides this is not sufficient

7    to show continuous presence.  There's no -- there's no

8    procedure that requires the noncitizen be told that this was

9    the deficiency that they found in it nor any opportunity to

10   correct it or even supplement the record afterwards.  Because

11   simply the immigration officer makes their decision and then it

12   is signed off by, you know, a superior officer on -- on, you

13   know, a pure paper review.

14        THE COURT:  Now, let me just be clear because I'm --

15   I'm so worried about the time, and I apologize for this

16   dragging on.

17        The requirement that one who is slated for expedited

18   removal prove their continuous presence, you're saying that

19   that really was not operable prior to now?

20        MR. BALAKRISHNAN:  I mean, the one place it might

21   have been operable was when they expanded it to people who are

22   arriving by sea and could be picked up nationwide.  That's the

23   one place, but it's never been applied to, you know, the large

24   amount of people who arrive -- you know, who cross the border

25   without inspection.

1            THE COURT:  But is that because we see them coming

2     across the -- I mean, just as a practical matter, it's

3     inapplicable because we know they weren't here for two years.

4            MR. BALAKRISHNAN:  I mean, for those who -- I'm

5     sorry.  I think -- you know, for those who immediately -- like,

6     for those within the 14-day category, for example, there the

7     continuous presence requirement is -- in practical terms is

8     likely not important, because, you know, as -- as in

9     *Thuraissigiam*, the Supreme Court case, people will be observed

10    immediately crossing the border or be found within yards of the

11    border itself, so there's usually no question as to the

12    continuous presence there.

13           But here as to this larger class of people, there are a

14    few questions, which is why, you know, the agency itself saw a

15    need to develop procedures to address these questions.

16           THE COURT:  All right.  So let me also get you to

17    focus on remedy.  Mr. Reuveni quickly said -- I know this is

18    totally off -- out of left field.  I'm going to have to rely on

19    a lot of what you have written just because we can't possibly

20    go through everything orally, and I'll give you a chance to say

21    the few things that you think are most important.

22           But Mr. Reuveni says even if you win, as far as the PI

23    is concerned, we need a list of your people so that it can be

24    executed because that is the extent of my authority.

25           MR. BALAKRISHNAN:  I think on that point, Your Honor

 1    has already addressed that argument in *Make the Road* -- you

 2    know, the previous decision in *Make the Road* when tailoring --

 3    when deciding the scope of relief on the first preliminary

 4    injunction, finding -- and I think correctly so -- that the --

 5    you know, a narrowing to just plaintiff members who, like,

 6    willingly gave themselves up to the government was

 7    impracticable.  I think, you know, it's impracticable for those

 8    who, you know, fear -- who are here without status and without

 9    documents.  It also raises the question of the fact that, you

10    know, there's also the many people who fear erroneous placement

11    in expedited removal.  So the class of people is very large.

12    And as a practical matter, the remedy that the government is

13    offering is unworkable, and I think your Court's decision in

14    *Make the Road* 1 covers that.  I think -- okay.

15                THE COURT:  Go ahead.

16                MR. BALAKRISHNAN:  No, no.  I -- you know, I wasn't

17    sure whether you wanted any sort of comment on sort of like the

18    Court's authority to enter sort of like preliminary injunctive

19    relief that -- you know, sort of along that line; but I also

20    think Your Honor's decision in *Make the Road* 1 and, you know,

21    its -- your decision in *Kiakombua*, even though that was a

22    question of final judgment, but sort of locating the source of

23    the power, the remedy, you know, in -- in *Kiakombua* and the

24    Court's inherent authority, both of that -- all of that

25    reasoning is equally applicable here in the PI context.

1          THE COURT:  All right.  So let me -- I'm going to

2     turn back to Mr. Reuveni.  Let me have you -- if there are

3     other practical points that you wanted to make, either a

4     response to what he said or in support of your argument, I do

5     have your briefs.  I do understand the arguments that you're

6     making in general, but I'll give you a chance to point to

7     anything in particular.

8          MR. REUVENI:  Thank you, Your Honor.

9        I'd like to just respond briefly.

10          THE COURT:  Oh, wait.  I'm sorry.  Sorry,

11    Mr. Reuveni.  I meant Mr. Balakrishnan.  I wanted him to finish

12    up.

13          MR. REUVENI oh, I'm sorry.

14          THE COURT:  That's all right.  No worries.

15          MR. BALAKRISHNAN:  No, it's fine, Your Honor.  I

16    don't -- unless you have specific further questions for me,

17    I'll -- I don't have anything at the point.

18          THE COURT:  Okay.  Mr. Reuveni.

19          MR. REUVENI:  Thank you.  Sorry for the confusion on

20    my end.

21        I just want to maybe make two general points.  I want to

22    respond very quickly to what Mr. Balakrishnan said about this

23    incorporation theory and some jurisdictional issues.  I want to

24    talk about the due process claim.

25        You have our arguments on the other two claims, and I

1    think our briefs are pretty thorough on those two other issues,

2    on the right to counsel and on this 1182(a)(7) point, but I --

3    if you have any questions about that, I'm happy to respond to

4    them and then close with just another -- I'm going to annoy you

5    to no end with this, but another last shot on the remedy issue.

6         But just for -- really quickly on jurisdiction.  I -- I

7    don't think it's right that no court has said anything one way

8    or the other on this incorporation theory that I -- as you put

9    it, I think Mr. Balakrishnan's argument is essentially any time

10   a new piece of paper comes out in arriving -- that incorporates

11   or references any prior statutory, regulatory policy, whatever,

12   however old, it's open season on that all over again.

13        And, I mean, for the reasons you -- you mentioned in

14   your colloquy with Mr. Balakrishnan on that, that doesn't seem

15   like what Congress intended, but I'd also just point the Court

16   to the D.C. Circuit recent *Grace* decision, which had a similar

17   although literally not directly on-point issue.  There were two

18   documents.  There was an attorney general decision, *Matter of*

19   *A.B.-*, and then there was a USCIS guidance document

20   implementing that decision in expedited removal proceedings.

21        And I think we quote the operative language in our

22   brief, but I'll just -- it's at pages 894 and 895 of the *Grace*

23   decision.  And there Judge Tatel for the majority panel says,

24   where -- essentially I'm going to quote here.  The two other

25   challenged policies -- I won't read what they are -- contained

1   in both the guidance document and in *Matter of A.B.-*, meaning

2   that they must address the district court's jurisdiction to

3   review the latter.  So there's got to be independent

4   jurisdiction, not to a sudden incorporation theory that takes

5   you back in time to start all over again to the actual first

6   policy document, statement, statute, and so forth.  And so I --

7   I don't think the D.C. Circuit has bought into the

8   incorporation theory.

9       I'd also say when Mr. Balakrishnan says this is the

10  first time ever that this is being applied to this class of

11  people, in -- in a technical sense that may be correct, but the

12  1997 rules, regulations implementing this didn't just make

13  rules for the people at the ports of entry.  It made rules for

14  this entire thing on the assumption that it would be expanded

15  at some point in the future to two years.

16      And we know that for two reasons; that the rulemaking

17  itself refers to, look, we know this is new.  We'd like to

18  figure this out at the ports of entry.  It refers to complexity

19  of applying it potentially to the interior.  We want to see

20  what's going on at the ports of entries, and then we're going

21  to expand it.  And then they did that five years later.

22      THE COURT:  Does that hurt you or help you,

23  Mr. Reuveni?  I mean, Mr. Balakrishnan says, fine, you can do

24  it that way, you don't have to put everything upfront, but each

25  time you add, you apply this to a new group of people as you

1   intended or hinted that you might do, that's a first

2   implementation with respect to that new group and you're

3   required to do, you know, what the APA says and what the

4   statute says concerning the procedures that should apply to

5   that new group.

6        MR. REUVENI:  So, no, I think it helps us, although

7   just something you said just now to respond to that.  I think

8   we're past the APA applying to that given *Make the Road* -- *Make*

9   *the Road* since they don't have to consider -- this is the exact

10  argument they made to the Court of Appeals.  And I'll look

11  at --

12       THE COURT:  Well, let me just -- I understood

13  Mr. Balakrishnan to be cabining *Make the Road* to the kind of

14  challenge that I perceived them to be making in that case,

15  which was to the Secretary's exercise of his discretion to

16  designate this new category.  Mr. Balakrishnan has now carved

17  out another agency action that he says *Make the Road* doesn't

18  speak to, and that is the agency action of applying certain

19  procedures to whatever designated group the Secretary has

20  decided.

21       MR. REUVENI:  So -- so let me answer that and then

22  get back to why I think the point I made before helps us.

23       I'll just refer the Court to page 633, and they made

24  this argument to the Court of Appeals in *Make the Road*.  They

25  said -- and I'm going to quote, and I'll read here.  I

1    apologize if I'm going too fast.  I'll try to go slow.

2    Plaintiffs reason that the expedited removal statute delineates

3    a process by which officers decide whether expedited removal

4    applies and whether noncitizens should receive further

5    proceedings on the claims for protection or residing lawful

6    status.  As a result, the association's claim to the Secretary

7    was -- and they're quoting here, the plaintiffs' position --

8    required to consider the ability to administer these standards

9    accurately and fairly when applying them to the new class of

10   noncitizens, end quote.

11        That's their argument here now.  And the Court said, no,

12   there's no review of that under the APA.  The Secretary -- so

13   unreviewable discretion means the Secretary doesn't have to

14   think about whether the procedures that already exist are good

15   enough or need to be expanded upon or need to be contracted or

16   need to be modified in any way.

17        So the Court of Appeals has already handled that at

18   pages 633 to 634, and that's even more persuasive, I think,

19   because, to go back to my first point, the Secretary -- or then

20   the -- it was the Attorney General or the INS commissioner, I

21   think, that actually did this; the procedures they put in place

22   were not just limited to ports of entry.

23        It would make no sense, for example, to have --

24   Mr. Balakrishnan refers to 235.3 and continuous presence.  So

25   that regulation has been the same since 1997, and it provides

1    at 235.3(B)(1)(ii) -- we cite this in our briefs -- procedure

2    for how one establishes continuous two-year presence.  They

3    have to affirmatively show that they were physically present.

4    And then what the ICE guidance has done for the first time --

5    they didn't do this 2002.  They didn't do this in 2004.  Nobody

6    sued about it then.  They've gone above and beyond and said

7    what kinds of evidence may be used for that, what kinds of

8    procedures may be used for that.

9         If you set aside the guidance, I'm not sure why that

10   helps plaintiffs, because then we have no guidance at all and

11   now we just have the regulations.  So now we can't use bank

12   statements, and we don't have 72 hours, and none of these

13   things that go above and beyond what the statute requires to

14   attempt to provide a meaningful, fair, but quick opportunity to

15   contest whether they have been here two years or less or

16   whether they're a citizen or whether they're otherwise someone

17   who should not be subject to the two-year expedited removal

18   statute.  That's all gone.

19        My point really, though, is that this was all put in

20   place in '97.  And if you take plaintiffs' argument to its

21   logical conclusion, you get a restart every new document.

22   Well, that means they can challenge the 2002 designation and

23   the 2004 designation and the 2017 designation.  Because if

24   they're right on the statute, then those things are unlawful

25   too.

1       And that can't be what Congress meant when it said we

2   want finality.  We want this to be finished.  But if you buy

3   what they're selling on the statute, then those things are gone

4   too.  Because those people -- 2002 is -- anywhere in the

5   country for two years arrives by sea.  So that already covers

6   everyone that they're talking about.  And someone is going to

7   potentially ask them did you arrive by sea.  So they're already

8   interacting with the government in that way.  They're already

9   subject to expedited removal in that way.  Anyone could have

10  arrived by sea, not just someone who looks like his shoes are

11  wet and just came out of the ocean.

12      So just finishing on jurisdiction, it -- it doesn't --

13  if plaintiffs are right, then there's just a restart every time

14  anyone does anything that incorporates the underlying statutes

15  and regs.  And that just can't -- that's not what we think

16  Congress meant.  But even -- even if you get there on the

17  merits, I think you -- you've made some points when you were

18  discussing this with Mr. Balakrishnan that I think are exactly

19  right.

20      And the problem for plaintiffs, I think -- and they're

21  not even moving for an injunction on their due process claim,

22  which is interesting.  They moved for it last time, but they're

23  not this time.

24      This time they moved on Claim 3, but then say do it as a

25  due process claim.  But to do that, you have to find the

1    statute to be ambiguous, and there's nothing ambiguous about

2    the statute.  The statute says you can do this up to two years

3    to anyone and set up some procedures and go from there.

4         And that's, again, to go back, *AILA* sort of addresses

5    this.  I think the -- the quote there that I think is

6    controlling law still; plaintiffs cannot impose any obligation

7    to afford more procedures than the governing statute requires

8    or that the Attorney General has chosen to afford in her

9    discretion.  Then that was Attorney General Reno.  That's at

10   page 56, 18 F. Supp. 2d at 56, affirmed by the Court of

11   Appeals.

12        So if we're talking about Claim 3, which is their

13   claim -- they didn't move on due process -- we have to find

14   some ambiguity in the statute, and there isn't any.  So we

15   don't really do any of this constitutional avoidance, *Mathews*

16   due process analysis.

17        Two other points on that, I think, just sort of to

18   resolve this question without getting into too much detail.

19   One, I think you -- if I understood what you were saying to

20   Mr. Balakrishnan -- and correct me if I'm misstating it -- I

21   think what you said was Congress gets to make the decision for

22   what the cutoff is in terms of, like, have you been here long

23   enough or you've been here longer.  And I think that's right.

24   That's what their decision says, but that's also what allowed

25   these other cases going back to the 1870s say.  When it comes

1    to admissibility, and not just due process at large -- just due

2    process with respect to one's rights to admission to the

3    country, Congress gets to set those rules.  And Congress gets

4    to say here's what we're going to give you and here's what

5    we're not going to give you.  And Congress made that decision

6    in 1225(b)(1)(B) -- or (A) and set it at two years.  And

7    everyone has been on notice that it could -- extended two

8    years, since '97, and it has been extended to two years, at

9    least with respect to sea arrival, since 2002.

10         But even if we get past that -- and we're talking now

11   about, okay, who has due process rights and who doesn't, I

12   think Your Honor is exactly right.  I don't think plaintiffs

13   can argue that everyone here more than 14 days and less than 2

14   years as a class can point -- can -- can say I have substantial

15   connections.  And that's the test.  And I think plaintiffs'

16   counsel suggests the rescission says otherwise, but the

17   rescission says right upfront, page 1964 -- -63 or -64,

18   plaintiffs must have, quote, established connections,

19   end quote, to a -- to assert something more than they're

20   entitled to something more with respect to their admission to

21   the country.

22         And we lay out in our brief, there's a number of cases

23   that do, in fact, address what that might mean.  It's got --

24   every single one of these cases, the Supreme Court in *Verdugo*,

25   the Third Circuit in *Osorio*, the Fifth Circuit in -- I want to

1    get this case right reading it into the record.  The Ninth

2    Circuit, I should say, in *Ibrahim*, and even the district court

3    in *AILA*, have all said you have need some sort of lawful

4    volunteer connections to the country, coming in to visit or you

5    have a tourist visa -- I'm sorry, a student visa for four years

6    or you're visiting your parents -- you cross -- you know, you

7    cross into Texas five times a month and you've been doing that

8    for years.

9        And plaintiffs have just not come forward with evidence

10   that their group of people they're talking about as a class

11   categorically come close to satisfying any of those tests.  So

12   that's no -- you don't strike down the statute or the

13   regulations on a facial basis, which is what they want, and

14   order us -- order the government to do something more than what

15   they're doing if they can't show as a class they have

16   substantial connections.

17       And, finally, on the due process, if we're getting into

18   just the balance -- I mean, plaintiffs act like these

19   regulations don't exist.  They act like 235.3, 208.30, 1208.30,

20   which we cite extensively and discuss in our briefs, just don't

21   exist.  But if we're talking about due process, it's notice and

22   an opportunity to be heard.  Not notice and an opportunity to

23   be heard in the same way as if you were in a normal removal

24   proceeding.  Notice and opportunity to be heard.

25       And the regulations provide notice.  That officers are

1    required to explain why you are being subjected to this

2    procedure.  They're required to make a paper record.  They're

3    required, if a number of things occur, if you show that you've

4    been here more than two years or if you say under penalty of

5    perjury I'm a citizen or I'm a Green Card holder or I'm a

6    refugee or have asylum status, okay, then everything stops and

7    you get to make your claim of you shouldn't be in here.

8         There's also the asylum procedures that provide for

9    three levels of administrative review, which the Supreme Court

10   just upheld.  And then you get limited review in district court

11   if you're -- no, this is not me, mistaken identity or, no, I

12   am, in fact, a citizen or a lawful permanent resident or an

13   asylum refugee.  So it's not full removal procedures, but

14   that's the point.  And what plaintiffs ask the Court to do is

15   say, okay, give them all your other additional procedures on a

16   sort of *Mathews* balance, but then that, of course, just

17   eliminates expedited removal as an option.  Period.  Full stop.

18   And I just don't think they've made the showing to do that,

19   particularly since they're not even moving on the due process

20   claim.

21        I don't want to keep everyone here too much longer.

22   I'm -- I'm having memories of what I asked you to let me

23   (inaudible) last time.  So I'm just going to quickly talk about

24   remedy again, and if you have other questions on -- unless you

25   have any other questions on the counsel claim or the 1182(a)(7)

1    claims or arguments in the brief, I just --

2            THE COURT:  I understand your argument.  I'll give

3    you one last moonshot on remedy before I turn back to

4    Mr. Balakrishnan.

5            MR. REUVENI:  Fair enough, Your Honor.

6        I do have to represent my clients' interests, and this

7    is what -- this is in their interest, I think.

8            I'd just refer the Court again to the injunction in

9    Maryland and the injunction in the District of California that

10   we referred to involving setting -- enjoining this at the

11   preliminary stage, justice to the individuals who are members

12   of the groups.  I mean, it might be different if plaintiffs

13   were representing a class of individuals, but, of course, there

14   can't be a class in a 1252(e) case, which is what this is.

15       They say, well, it's simply impractical to give the

16   government the names of our people so they don't remove them or

17   subject them to expedited removal procedures.  It's not the

18   government's burden to show why it is practical.  It's the

19   plaintiffs' burden to show why it isn't.  I mean, that's

20   *Winter*.  They have the burden.  They're seeking a preliminary

21   injunction.  They want you to set this aside promptly, which is

22   under extraordinary remedy as the Court has said repeatedly.  I

23   haven't heard anything from plaintiffs' counsel why it's not

24   practical, particularly if you're able, as you are -- you issue

25   an order that says here's -- here's the injunction.  If ICE

1    does any of these things, sanction, contempt.

2            THE COURT:  So you're not moved by the circumstance

3    that we find ourselves in, which is that these are people who

4    are in the United States without permission, who are

5    maintaining that the government has, you know, acted improperly

6    in potentially subjecting them to expedited removal, but they

7    say we don't need to be identified in order to make that kind

8    of claim.  We have an association.  The association is bringing

9    the claim on our behalf.  Nobody is questioning that they

10    actually do have individual members.

11        And I guess even if you're right about the way

12    preliminary injunctions ordinarily work, one could perceive in

13    the realm of equity, which is sort of how I'm operating anyway

14    when I'm talking about injunctive relief, an exception for a

15    situation like this that would not require the association to

16    give up or list or provide for the government the names of all

17    these people in order for the government to be preliminarily

18    enjoined from implementing an expedited removal procedure.

19        Remember, if plaintiffs win, as I'm interpreting the

20    statute, they have established successfully that we have a

21    facial problem with the government's activity.  But yet for the

22    purpose of the preliminary injunction, even if one would

23    ordinarily only allow for an injunction relative to the

24    plaintiffs regarding that success, I can see a world in which

25    we'd have an exception here that would go along the lines of --

 1    unless it's impracticable to do so, and as I pointed out in

 2    *Make the Road*, it appears to be so when the plaintiffs are not

 3    known to the government.

 4            MR. REUVENI:  So I'll try to be very brief.  A couple

 5    quick responses.

 6            No, I don't -- I don't think that moves me, and here's

 7    why.  Just -- just legalese, I mean, you'll -- you'll recall

 8    when we were in this strange interregnum between is this being

 9    implemented or not and the time you've had -- you needed to

10    write your -- your order last time, you came, I think, this

11    close to ordering the government to inform the Court or

12    plaintiffs of everyone they're subjecting to the designation so

13    that plaintiffs can check their membership lists for if any of

14    those people are their members and then file a TRO with you.

15    And you didn't end up doing that because the government didn't

16    want to do that.  So they just didn't implement it for three

17    weeks, and then you wrote your decision, and then that was the

18    end of that.

19            But that's the same sort of thing that I'm proposing

20    here.  I'm not aware of any cases --

21            (Indiscernible simultaneous cross-talk.)

22            THE COURT:  And, Mr. Reuveni, it's actually the flip

23    side that is troubling to me.  It's one thing to say when the

24    government encounters a person on the street and they

25    implement or seek to implement this expedited removal process

1    because the person can't cough up the documents that show that

2    they've been here long enough, the government has to notify the

3    plaintiffs' group that this is a person they seek to apply this

4    to.  Plaintiffs, tell us is this one of your people and then we

5    don't do it; right?

6        I mean, that seems practicable because the government

7    has the person in hand, they know who they are, and we can have

8    the plaintiffs check in that moment as to whether or not this

9    is the person.  But it doesn't seem practicable to me to have

10   it go the other way; where the plaintiffs give up all their

11   people and the government is checking against the plaintiffs'

12   list every time they encounter someone.  And it's because we

13   can't give the list, says the plaintiff.  Not because the

14   government couldn't do that very thing; right?  It's because we

15   can't give the list.

16       MR. REUVENI:  I mean, we're -- we're happy to on an

17   expedited basis give you some sort of explanation on remedy as

18   to why we think it is practical.  Just -- for the way it would

19   work is you take the names, you put them in the system.  Now

20   they're in the system.  You can't remove these people.  If, you

21   know, some mistake happens, we'll pay the consequences.  The

22   consequences will be contempt.  The consequences will be bring

23   that person back right away.

24       (Indiscernible simultaneous cross-talk.)

25       THE COURT:  Wouldn't the consequence also -- wouldn't

1    the consequence also be that noncitizens who are unlawfully --

2    at least for now, who have no permission to be in the

3    United States would give up their right to bring any sort of

4    claim?  Because if the government's entire point is even if you

5    win, you've got to tell us who you are, you've essentially

6    eliminated the ability for this category of plaintiffs to

7    pursue any relief regarding any of these immigration-type

8    statutes; right?

9            MR. REUVENI:  How -- how is that right?  I mean, I --

10   I think they can bring their own claim.  If -- if we violate a

11   court order, of course, that's the claim right there.  If they

12   have some other arguments to make on their own, like I've been

13   here more than two years, you can't apply the statute to me,

14   they can make that.  And the plaintiffs' counsel in this case

15   will surely assist them in doing that.  I'm not inviting that

16   litigation.  I -- I don't want -- I don't want to have a

17   hundred cases all at once.

18         But my point is simply it's not impractical, and there's

19   a way if you'll give us -- if you're leaning towards an

20   injunction, which, you know, you may be, I ask you give us an

21   opportunity very quickly to brief why our version of the

22   injunction is practical.

23         And the last thing I would say, because we didn't have

24   to address this before, the other reason why I don't know that

25   this moves the needle a hundred percent is, again, we have the

1    statute 1252(f).  And you didn't have to address that last time

2    because you said to the government you violated the APA because

3    you didn't do notice and comment and it's arbitrary and

4    capricious.

5          But that's not an argument now under *Make the Road*.  Now

6    we're talking about did you exceed your statutory authority.

7    And 1252(f) says, of course, no authority to issue an

8    injunction that stops operation of the statute, other than with

9    respect to individuals in removal procedures, which at this

10   point is nobody.  But putting that side for the minute, what --

11   what that means is if you enjoin the government from applying

12   expedited removal procedures to this new class of individuals,

13   you are in effect enjoining operation of the statute.

14         You don't have to just say 1225(b)(1)(B) or (A) -- I'm

15   sorry -- 1225(b)(1)(A) is unconstitutional.  That -- because

16   you could say that and that's a fair injunction of the statute,

17   but there's only one way the government operationalizes

18   statute.  It issues a piece of paper called a designation or

19   notice saying you may now use your full authority, and if you

20   set that aside, you're setting aside operation of the statute.

21   There's really no other practical way for the government to

22   implement this statute without someone saying I'm exercising my

23   authority, sole and unreviewable authority, to say, please, all

24   officers of the government, you cannot use this authority.

25         And so if though that's another reason to do an

1    injunction because -- that is limited to people who are their

2    members -- I mean, I think the statute goes much further.  It

3    says unless you're actually in proceedings, no injunction.  And

4    I think this is different than before, because we're not --

5    this is not agency action.  This is the statute itself.  It's

6    operationability -- operability being enjoined.

7          So it's another reason, I think, we go the route of the

8    District Court in Maryland and the District Court in the

9    Northern District of California of limiting the injunction to

10   plaintiffs and their members.

11         And I'll -- I don't want to say any more about it.  I'm

12   happy to rest on my papers, but if you find any merit to what

13   the government is saying at all, we would ask that you give us

14   an opportunity to brief at the appropriate time.

15             THE COURT:  Mr. Balakrishnan, let me give you the

16   final word.

17             MR. BALAKRISHNAN:  And unless Your Honor has specific

18   questions you want me to answer, I'll be very brief because I

19   think much of this is already in our briefs and fully

20   addressed.

21         You know, I just want to make, sort of, one very quick

22   point, which is, you know, the government has changed the

23   procedures that are used to implement expedited removal

24   specific to this class in their most recent ICE policy; thus,

25   recognizing that the original procedures they created were not

1    sufficient.  If we had challenged -- if we had attempted to

2    challenge these procedures as applied to people who had been in

3    the country -- who had entered the United States and been in

4    the country continuously present in 1997, we would have had no

5    standing.  We would have also likely have been told that -- we

6    would have also likely been asked the question of how do we

7    even know what procedures the government will use against this

8    new class given that they've not even been designated yet.

9         And I think that that just goes to the point sort of

10   explaining why the newly designated class needs to have an

11   opportunity to challenge the procedures implementing the

12   statute against them.  There was no opportunity to do so

13   before.  The original regulations are plainly insufficient, and

14   the newly created procedures are as well.

15            THE COURT:  And when you say the ICE policy, you mean

16   what we termed was the implementation document?

17            MR. BALAKRISHNAN:  That's correct, yeah, the

18   October 2nd, 2020, implementation document -- or memo.

19            THE COURT:  All right.  Finally, I will ask you just

20   in response to what Mr. Reuveni left off with, would a court

21   order -- let's assume -- for a second, setting aside

22   preliminary versus final -- would a court order enjoining the

23   agency from applying the expedited removal procedures to this

24   new class of people effectively enjoin the statute in a way

25   that violates 1252(f)?

1    MR. BALAKRISHNAN:  No, Your Honor.  Because the

2    underlying question here -- I mean, this -- I think this is

3    really specific to our claim under -- you know, that the

4    procedures violate the INA itself.  We have our additional

5    arbitrary and capricious claim, for example.  You know, the --

6    the underlying question here is how is the -- how -- how

7    should -- how is this underlying statute correctly interpreted?

8    If the policies they've created violate the statute as

9    correctly interpreted, this Court is not enjoining the statute.

10   This Court is, in fact, enforcing the lawful interpretation of

11   the statute to enjoin illegal policies.  You know, that's --

12   you know, there's a number of courts that have explained that

13   reasoning.  For example, the Ninth Circuit in the *Rodriguez*

14   case thoroughly has explained that reasoning, along with

15   others, but that is why 1252(f) doesn't bar relief for our

16   clients.

17   THE COURT:  All right.  Thank you, all.  And I

18   appreciate your patience.  I'm sorry we've gone longer than I

19   had hoped in this format, but I do appreciate all of your work.

20   I will take --

21   Did you have something else to say, Mr. Balakrishnan?

22   MR. BALAKRISHNAN:  Your Honor, I think my --

23   Mr. Amdur just alerted me.  Is there a question -- do we know

24   when we're -- I think there was a question as to the timing of

25   an additional filing on Gaynor -- on the Gaynor memo.

1      THE COURT:  Yes.  Ms. Cutri-Kohart, you did mention

2  wanting to have the opportunity to file something else.  The

3  government asked for a week, I believe, in the original

4  colloquy, but maybe you can clarify.

5      MS. CUTRI-KOHART:  Yes, Your Honor.  We'd request a

6  week.  So I think that would put a deadline on November 20th.

7  That would give us time to both investigate the facts of the

8  timing of the filing and also provide you maybe a short brief

9  on the implications in terms of the ratification argument.

10      THE COURT:  All right.  And I assume, Mr. Amdur, you

11  would want the opportunity to respond to any government filing

12  in this regard; right?

13      MR. AMDUR:  Yes, Your Honor, we -- we'd want the

14  opportunity to respond.  And I guess I would just say, you

15  know, a week sounds a little long to me because, you know, this

16  issue really doesn't impact any of the reasons why we would win

17  on our existing claims.  You know, if -- if 3348 bars

18  ratification, this wouldn't change that.  If the reasons in

19  Judge Moss's opinion bar ratification, this also wouldn't

20  change that.  It's just an additional reason that ratification

21  might be invalid, which I take the government may or may not

22  attempt to cure.

23      So, you know, I mean, I defer to what Your Honor

24  prefers, but, you know, I might say earlier than next week.

25      THE COURT:  I'm inclined to give them the week

1    because I can certainly be evaluating other aspects of this

2    while they're working as well.  And, you know, I'm going to

3    need time to go through everything and make a determination.

4    So assuming I give them the week -- they're asking for until

5    Friday of next week.  I know Thanksgiving is in the following

6    week, but when do you-all think you can respond?  Mr. Amdur.

7                   MR. AMDUR:  Right.  You're saying if the government

8    files a week from today?

9                   THE COURT:  If the government files a week from

10   today, what I am hearing from Ms. Cutri-Kohart is that it

11   wouldn't just be the facts or the circumstances but also their

12   understanding of the implications that that finding has for the

13   arguments that have been made.  So it's something of a little

14   brief around this issue.  And I assume that you would want to

15   be able to respond.  Maybe -- maybe their brief will say we

16   give up the argument, in which case your response will be easy;

17   but if they persist, how long would you like to respond?

18                   MR. AMDUR:  We could respond by the following

19   Tuesday.

20                   THE COURT:  By the 24th.  All right.

21        So that means I will go into the Thanksgiving holiday

22   with all of the information that I need.  I can't make any

23   promises right now as to when I'm going to be able to respond.

24   I do recognize this is a preliminary injunction and that --

25                   Mr. Reuveni, do you know if the government is enforcing

1    this policy as we speak?

2              MR. REUVENI:  Yes, they are.

3              THE COURT:  All right.  So I will be mindful of that

4    in terms of trying to get the answer to you, but I'll issue an

5    order that requires the government to issue its follow-up on

6    this one point by next Friday.  We'll have the plaintiffs'

7    response by Tuesday, the 24th, and then I will work as

8    expeditiously as I can to get you an answer.

9              Does that satisfy everybody in the moment?  I see nods

10   on our Zoom.  Maybe everyone is exhausted and hungry so we'll

11   leave.

12             Thank you.  I will take it under advisement, and you

13   will be hearing from me.  Thanks.

14             (The proceedings concluded at 1:10 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3           I, Nancy J. Meyer, Registered Diplomate Reporter,

4   Certified Realtime Reporter, do hereby certify that the above

5   and foregoing constitutes a true and accurate transcript of my

6   stenograph notes and is a full, true, and complete transcript

7   of the proceedings to the best of my ability.

8

9               Dated this 14th day of November, 2020.

10

11              /s/ Nancy J. Meyer
                 Nancy J. Meyer

12             Official Court Reporter
                 Registered Diplomate Reporter

13             Certified Realtime Reporter
                 333 Constitution Avenue Northwest, Room 6509

14             Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25